



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

JUN 30 2005

CLERK, U.S. DISTRICT COURT
By _____
        Deputy

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

220522

3-05CV1323-B

| | | |
|---|---|---|
| ALASKA U.F.C.W. PENSION TRUST, on Behalf of Itself and All Others Similarly Situated and Derivatively on Behalf of WYNDHAM INTERNATIONAL, INC., | § § § § | Civil Action No.<br><br>**CLASS AND DERIVATIVE ACTION** |
| Plaintiff, | § § | |
| vs. | § § | |
| FRED J. KLEISNER, KARIM A. ALIBHAI, MARC BEILINSON, LEON D. BLACK, LEONARD BOXER, ADELA CEPEDA, MILTON FINE, LEE S. HILLMAN, THOMAS H. LEE, ALAN M. LEVENTHAL, WILLIAM L. MACK, LEE S. NEIBART, MARC J. ROWAN, ROLF E. RUHFUS, LAWRENCE RUISI, SCOTT A. SCHOEN, SCOTT M. SPERLING, LYNN C. SWANN and SHERWOOD M. WEISER, | § § § § § § § § § § § § | |
| Defendants, | § § | |
| – and – | § § | |
| WYNDHAM INTERNATIONAL, INC., a Delaware corporation, | § § § | |
| Nominal Defendant. | § § | **DEMAND FOR JURY TRIAL** |

**CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT**

1.     This is a class and shareholder derivative action brought against the members of the Board of Directors of Wyndham International, Inc. ("Wyndham" or the "Company"), on behalf of Wyndham and its public shareholders for breach of fiduciary duty, abuse of control, gross mismanagement and waste of corporate assets arising out of defendants' attempts to provide certain Wyndham insiders and directors with preferential treatment in connection with their efforts to complete the sale of Wyndham to The Blackstone Group ("Blackstone") for $1.15 per share in cash for each share of Wyndham common stock (the "Proposed Acquisition").

## SUMMARY OF THE ACTION

2.     Wyndham offers upscale and luxury hotel and resort accommodations through proprietary lodging brands and a management services division.  Based in Dallas, Wyndham owns, leases, manages and franchises hotels and resorts in the United States, Canada, Mexico, the Caribbean and Europe.

3.     On June 14, 2005, Wyndham announced that its Board of Directors had entered into an agreement with Blackstone wherein Blackstone would acquire all outstanding Class A common stock of Wyndham and all Class B preferred stock in a transaction valued at approximately $3.24 billion, including assuming $1.8 billion in debt, pursuant to terms which substantially benefit the preferred shareholders to the detriment of Wyndham's common shareholders.  The holders of the preferred stock, led by Wyndham directors affiliated with Apollo Management, L.P. (the "Apollo investors"), Beacon Capital Partners, Inc. (the "Beacon investors") and Thomas H. Lee Partners (the "THL investors"), will receive approximately $1.19 billion, *or $72.17 per share*.  The holders of the common stock will receive the remaining $250 million, or *$1.15 per share*.  The preferred enjoy a significant voting advantage over the common stock holders as alleged herein.

- 1 -

4.     In pursuing the unlawful plan to sell Wyndham, each of the defendants violated applicable law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, candor, due care, independence, good faith and fair dealing.

5.     Under the terms of the Proposed Acquisition, Wyndham's controlling stockholders — entities affiliated with Apollo investors, THL investors, Beacon investors, PaineWebber Capital Inc., Chase Capital Partners and Walt Disney Co. CEO Michael Ovitz – will receive $72.17 a share for their convertible preferred, *or approximately $1.16 billion*. The Proposed Acquisition will net them a profit on the $1 billion the controlling preferred shareholders invested in Wyndham in 1999, in addition to the cash dividend payment of $29,250 per year each preferred stock share has been granted since 1999.

6.     The Company's common stock holders, which receive no dividends, will share *approximately $199 million*.

7.     As of April 20, 2005, the preferred shares owned by the controlling preferred holders were convertible into 200.2 million Class A shares, which would have been cashed out at just $176 million under the terms of the Proposed Acquisition.

8.     In April 2005, the Company announced a $1.65 billion refinancing, and two weeks later announced it was undertaking a massive stock recapitalization which, if completed, would have converted all preferred stock into common stock.

9.     On April 15, 2005, the Company announced that it had entered into a definitive recapitalization agreement with certain investors in Wyndham's Series B Preferred Stock. In the recapitalization, the existing classification of Wyndham's common stock would be eliminated, all outstanding shares of Series A and Series B Preferred Stock (including accrued but unpaid dividends) would be converted into common stock and the existing common stockholders would continue to hold shares of common stock. At the closing of the transaction, the holders of the

Series A and Series B preferred stock would own approximately 85% of the outstanding common stock of Wyndham and the existing common stockholders would own approximately 15% of the outstanding common stock of Wyndham.

10.     In May 2005 the Company completed the $1.65 billion refinancing of its corporate credit facilities and the majority of its outstanding mortgage debt, including extending its corporate debt maturities to 2011 (90% of Wyndham's outstanding debt) and pre-funding $100 million in capital to be invested into the Company's owned and leased properties. This was undertaken to assist the controlling preferred stock holders.

11.     Pursuant to the terms of their preferred stock issued in June 1999, preferred stock dividends were payable quarterly, on a cumulative basis, at a rate of 9.75% per year, for the first six years with the dividends structured to ensure an aggregate fixed cash dividend payment of $29,250 per year. However, Wyndham's credit facility prohibited it from paying the cash portion of the preferred stock dividend until expiration or further amendment of its credit facility and the cash portion of the dividend had not been paid but had accrued since 2002. As of December 31, 2004, cash dividends totaling $102.3 million on the preferred stock had been in arrears and unpaid for a period of more than 60 days.

12.     The first six year term of the preferred stock agreement would expire in June 2005 and from that point forward the Board, in compliance with its fiduciary duties, would have to determine if the preferred stock should get cash or stock dividends. Moreover, in June 2005 another provision would expire requiring that if a change in control or a liquidation of Wyndham occurred, any accrued dividends had to be immediately accelerated and paid. Moreover, at the end of the six year period in June 2005, the preferred stock was redeemable by Wyndham and the Board, in compliance with its fiduciary duties would be forced to decide whether or not to redeem the preferred stock, thus terminating the preferred dividend at a rate of 9.75% per year.

- 3 -

13.     On May 17, 2005, Wyndham filed a Form 8-K with the Securities and Exchange Commission (the "SEC") advising that its previously issued financial statements for fiscal 2004 could "no longer be relied upon":

> **ITEM 4.02A   NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW**
>
> During the quarter ended March 31, 2005, as Wyndham International, Inc. (the "Company" or "Wyndham") was continuing to remediate internal controls over financial reporting previously disclosed in its December 31, 2004 Annual Report on Form 10-K, the Company identified an additional tax charge of $1.7 million related to 2004 and reconsidered other previously identified but deemed immaterial adjustments related primarily to accruals of unbilled legal and consulting fees aggregating $1.8 million related to 2004. The Company's Audit Committee and management consider the charges to be immaterial to the Company's financial position and the results of operations for the year ended December 31, 2004. *However, even though the adjustments are only 0.14% of the first quarter 2005 total assets, 0.15% of total liabilities, 2.5% of shareholders' equity and 1.2% of the first quarter 2005 total revenues, the $3.5 million adjustments as a percentage of the first quarter 2005 loss from continuing operations of $48,000 are significant. As a result, on May 11, 2005 it was determined that the financial statements for the year ended December 31, 2004 should no longer be relied upon.*
>
> The restatement resulted in the Company adjusting its previously reported 2004 net loss of $509.5 million ($4.01 per share) to net loss of $512.9 million ($4.03 per share).

14.     On May 17, 2005, the Company also amended its previously filed Form 10-K for the fiscal year ending December 31, 2004, indicating that the 10-K had not been updated based on the review conducted and that only the limited changes had been made as outlined in the preceding paragraph:

> This amended Annual Report on Form 10-K/A has not been updated except as required to reflect the effects of the foregoing restatement. In order to preserve the nature and character of the disclosures set forth in such items as originally filed, no attempt has been made in this amendment to modify or update the disclosures in the original Annual Report on Form 10-K except for the foregoing restatement. *As a result, this amended Annual Report on Form 10-K/A contains forward-looking information which has not been updated for events subsequent to the date of the original filing, and all information contained in this amended Annual Report on Form 10-K/A and the original Annual Report on Form 10-K is subject to updating and supplementing as provided in the periodic reports that the Company has filed*

*and/or will file with the SEC after the original filing date of the Annual Report on Form 10-K.*

15.     On May 24, 2005, the fiscal 2004 10-K was once again amended to add the report of Wyndham's independent accountants made in connection with the restatement:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders
Wyndham International, Inc.:

We have completed an integrated audit of Wyndham International Inc.'s 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

\*       \*       \*

As described in Note 2b to the consolidated financial statements, the Company has restated its 2004 consolidated financial statements.

**Internal control over financial reporting**

Also, we have audited management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, *that Wyndham International Inc. did not maintain effective internal control over financial reporting as of December 31, 2004, because Wyndham International, Inc. did not maintain effective controls over the accounting and review of income taxes and the determination of deferred income taxes and the related valuation allowance,* based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit.

\*       \*       \*

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weakness has been identified and included in management's assessment. As of December 31, 2004, Wyndham International, Inc. did not maintain effective controls over the accounting and review of income taxes and the determination of deferred income taxes and the related valuation allowance.

- 5 -

Specifically, the Company did not maintain effective controls over the reconciliation of its income tax assets and liabilities to the underlying differences between the tax basis and accounting basis of each component of the Company's balance sheet. In addition, the related income tax asset valuation allowance was not reconciled to the underlying supporting detail. This control deficiency resulted in an audit adjustment to the fourth quarter 2004 consolidated financial statements. For the quarter ended March 31, 2005, the Company identified an additional adjustment of a write-off of income tax receivable related to 2004, which resulted in the restatement of the 2004 financial statements described in Note 2b. *Additionally, this control deficiency could result in a misstatement of income taxes payable, deferred income tax assets and liabilities and the related income tax provision that could result in a material misstatement to the annual or interim financial statements that would not be prevented or detected.* Accordingly, management determined that this control deficiency constitutes a material weakness.

*     *     *

/s/ PricewaterhouseCoopers LLP
Dallas, Texas

March 15, 2005 with respect to our opinion relating to the consolidated financial statements and financial statement schedules, except for Note 2b to the consolidated financial statements related to accounting for income taxes, as to which the date is May 16, 2005, and April 8, 2005 with respect to our opinions relating to internal control over financial reporting, except for the penultimate paragraph of Management's Report on Internal Control Over Financial Reporting, as to which the date is May 16, 2005.

16.    The preferred stock reorganization was never undertaken after the credit agreement was renegotiated and instead defendants agreed to the terms of the Proposed Acquisition which unfairly prefers the interests of the preferred shareholders to those of the minority common stock holders.

17.    Several other potential buyers approached expressed interest in purchasing Wyndham, including Goldman, Sachs & Co.'s Whitehall Street Real Estate Funds, represented by Joseph Frumkin and Anthony Colletta of Sullivan & Cromwell LLP; Marriott International Inc.; and a consortium of Starwood Hotels & Resorts Worldwide Inc. and Morgan Stanley.

18.    Defendants have also breached their fiduciary duties by failing to provide material disclosures to Wyndham's public shareholders prior to the announcement of the Proposed Acquisition, thus putting an artificial cap on the Company's common stock and preventing the full

value of Wyndham's common stock from being realized. Specifically, defendants have refused to disclose the full extent of their negotiations with alternate potential acquirers, whether alternative offers were formally proposed, what the terms of alternative offers were and whether the terms of alternative offers would have provided more value to Wyndham's non-affiliated shareholders. Defendants have also concealed any additional effects the restatement and investigation concerning its inadequate internal controls revealed. Finally, defendants have concealed the favorable financial results of Wyndham's second quarter of 2005 which ended on May 31, 2005, a full two weeks prior to the announcement of the Proposed Acquisition.

19.     In pursuing the unlawful plan to cash out Wyndham's public stockholders for grossly inadequate consideration, and pursuant to grossly inadequate quote terms, each of the defendants violated applicable laws by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing. The Wyndham Board is not disinterested and is riddled with conflict, including the fact that the Class B preferred stockholders and specifically the Apollo investors, the Beacon investors and the THL investors, control the Board of Directors through their voting stock. The preferred stock holders have used their control to negotiate a sale of Wyndham that disposes of Wyndham at a price and pursuant to terms which benefit preferred holders to the detriment of common stock holders.

20.     Defendants' ongoing pattern of misconduct has caused, and continues to cause, severe injury to Wyndham and its shareholders. Only via this action can redress be obtained for Wyndham and measures be implemented to avoid the ongoing injury to Wyndham and its operations.

### JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(a)(2), because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on this Court

that it would not otherwise have. This Court has personal jurisdiction over defendants because they either reside within this District and/or engaged in conduct that had a substantial impact within this District.

22.     Venue is proper under 28 U.S.C. §1391(a) because one or more defendants either resides in or maintains executive offices in this District, many of the acts and transactions complained of herein occurred in this District and defendants conduct business in this District.

## THE PARTIES

23.     Plaintiff Alaska U.F.C.W. Pension Trust is, and at times relevant to the allegations raised herein was, the owner of shares of Wyndham common stock. Plaintiff is a citizen of Alaska.

24.     Nominal party Wyndham International, Inc. is a Delaware corporation and has its principal place of business located at 1950 Stemmons Freeway, Suite 6001, Dallas, Texas 75207.

25.     Defendant Fred J. Kleisner ("Kleisner") is, and at all relevant times, was a Class A Director of the Company. He is also the Chairman, President and Chief Executive Officer of the Company. Kleisner has served as Chairman of the Board since October 13, 2000 and as Chief Executive Officer since March 27, 2000. From July 1999 to October 2000, defendant Kleisner served as President, and from July 1999 to March 2000, Kleisner also served as Chief Operating Officer. In 2004, Kleisner received $1.75 million in salary and bonus, including $500,000 of a $2 million retention bonus. Pursuant to his employment agreement, Wyndham has made several loans to Kleisner. In 1999, the Company loaned him $500,000. The Company loaned him an additional $665,000 in 2001. As of December 31, 2004, $1,219,000 in principal and accrued interest remained outstanding on these loans. Kleisner is a citizen of Texas and can be served at 3510 Turtle Creek Blvd., Apt. 17A, Dallas, Texas 75219.

26.     Defendant Karim A. Alibhai ("Alibhai") is a member of the Board of the Company. Alibhai is, and at all relevant times, was a Class A Director of the Company. Alibhai previously

served as Wyndham's President and Chief Operating Officer from 1997 until May of 1999. Defendant Alibhai holds an ownership interest in three Wyndham hotels. In 2004, Wyndham provided over $1.3 million worth of hotel management, franchise and other services to these hotels. Additionally, Alibhai is a principal of the Gencom Group. On December 22, 2004, Wyndham sold six Summerfield Suites hotels and a 33% interest in the Summerfield brand for $104 million to Sum Business Holdings, LLC. Sum Business Holdings is indirectly owned by Gencom American Hospitality, Inc., which is controlled by Alibhai and his family. Alibhai is a citizen of Texas and can be served at 5910 Laguna Falls Court, Houston, Texas 77041.

27.     Defendant Marc Beilinson ("Beilinson") is a member of the Board of the Company . Defendant Beilinson is, and at all relevant times, was a Class C Director of the Company. Beilinson is a citizen of California and can be served at 1871 Michael Lane, Pacific Palisades, California. 90272.

28.     Defendant Leon D. Black ("Black") is a member of the Board of the Company. Black is, and at all relevant times, was a Class B Director of the Company. He is also a Senior Partner of Apollo Management, LP. Defendant Black is one of the founding principals of Apollo Advisors, LP. Apollo and Wyndham have an ongoing relationship in that Apollo owns and operates several Wyndham hotels that generated approximately $3 million in management, franchise and service fees in 2004. Apollo holds the majority of Wyndham's preferred stock. Black is a citizen of New York and can be served at 760 Park Avenue, #3, New York, New York 10021.

29.     Defendant Leonard Boxer ("Boxer") is a member of the Board of the Company. Defendant Boxer is, and at all relevant times, was a Class A Director of the Company. Boxer has served as a partner and chairman of the real estate department of the law firm of Stroock & Stroock & Lavan LLP. In 2004, Wyndham retained Stroock & Stroock & Lavan to advise the Company on numerous property transactions. During 2004, Wyndham paid Stroock & Stroock & Lavan

approximately $352,000 in fees and Strook & Strook & Lavan has a *bona fide* expectation of receiving continuing business from the combined entity. Boxer is a citizen of New York and can be served at 875 Park Avenue, #5D, New York, New York 10021.

30.     Defendant Adela Cepeda ("Cepeda") is a member of the Board of the Company. Defendant Cepeda is, and at all relevant times, was a Class A Director of the Company. Cepeda is a citizen of Illinois and can be served at 5016 South Greenwood Avenue, Chicago, Illinois 60615.

31.     Defendant Milton Fine ("Fine") is a member of the Board of the Company. Defendant Fine is, and at all relevant times, was a Class A Director of the Company. Fine was the co-founder of Interstate Hotels Company in 1961. He previously served as Chairman of Interstate prior to its being acquired by Wyndham in 1998. Pursuant to a shareholders agreement dated December 2, 1997 between defendant Fine and Wyndham's predecessor in interest Patriot, Wyndham must indemnify Fine for certain tax liabilities until December 2, 2007. During the first quarter of 2005, Wyndham paid $378,464 to certain entities related to Fine in consideration for Fine releasing Wyndham from any continuing liability under a shareholders agreement. Additionally, Fine holds an ownership interest in two Wyndham hotels. In 2004, Wyndham provided approximately $844,188 in hotel management, franchise and other services to these hotels. Fine is a citizen of Pennsylvania and can be served at 145 Old Mill Road, Pittsburgh, Pennsylvania 15238.

32.     Defendant Lee S. Hillman ("Hillman") is a member of the Board of the Company. Defendant Hillman is, and at all relevant times, was a Class C Director of the Company. Hillman is a citizen of Illinois and can be served at 328 Shoreline Court, Glenco, Illinois 60022.

33.     Defendant Thomas H. Lee ("Lee") is a member of the Board of the Company. Defendant Lee is, and at all relevant times, was a Class B Director of the Company. Lee founded Thomas H. Lee Company in 1974 and since then has served as its President. In 1999, the Company changed its name to the Thomas H. Lee Partners. Since 1999 Lee has served as Chairman and CEO

of Thomas H. Lee Partners and as President of Thomas H. Lee Capital. Lee is a citizen of Massachusetts and can be served at Thomas H. Lee Company, 100 Federal Street, 35th Floor, Boston, Massachusetts 02110.

34.    Defendant Alan M. Leventhal ("Leventhal") is a member of the Board of the Company. Defendant Leventhal is, and at all relevant times, was a Class B Director of the Company. Leventhal is Chairman and Chief Executive Officer of Beacon Capital Partners, Inc. Beacon presently holds Wyndham preferred stock. Leventhal is a citizen of Massachusetts and can be served at 18 Pine Road, Chestnut Hill, Massachusetts 02467.

35.    Defendant William L. Mack ("Mack") is a member of the Board of the Company. Defendant Mack is, and at all relevant times, was a Class B Director of the Company. He is also a senior partner and one of the founding principals of Apollo Real Estate Advisors, LP. Mack is a citizen of New York and can be served at Apollo Real Estate Advisors, Two Manhattenville Road, 2nd Floor, Purchase, NY 10577.

36.    Defendant Lee S. Neibart ("Neibart") is a member of the Board of the Company. Defendant Neibart is, and at all relevant times, was a Class B Director of the Company. He is also a senior partner and one of the founding principals of Apollo Real Estate Advisors, LP. Neibart is a citizen of New York and can be served at 10 Beech Hill Lane, Pound Ridge, New York 10576.

37.    Defendant Marc J. Rowan ("Rowan") is a member of the Board of the Company. Defendant Rowan is, and at all relevant times, was a Class B Director of the Company. Rowan is also a senior partner and one of the founding principals of Apollo Advisors, LP. Rowan is a citizen of New York and can be served at 1601 Deerfield Road, Water Mill, New York 11976.

38.    Defendant Rolf E. Ruhfus ("Ruhfus") is a member of the Board of the Company. Defendant Ruhfus is, and at all relevant times, was a Class A Director of the Company. Ruhfus was previously the Chief Executive Officer of Summerfield Hotel Corporation prior to its being acquired

- 11 -

by Wyndham in 1998.    Defendant Ruhfus holds an ownership interest in seven different Summerfield Suites Hotels.    In 2004, Wyndham provided approximately $1.1 million in hotel management, franchise and other services to these hotels.  Ruhfus is a citizen of Kansas and can be served at 565 North Broadmoor, Wichita, Kansas 67226.

39.    Defendant Lawrence Ruisi ("Ruisi") is a member of the Board of the Company. Defendant Ruisi is, and at all relevant times, was a Class C Director of the Company.  Ruisi is a citizen of New York and can be served at 121 Whippoorwill Road, Armonk, New York 10504.

40.    Defendant Scott A. Schoen ("Schoen") is a member of the Board of the Company. Defendant Schoen is, and at all relevant times, was a Class B Director of the Company.  Schoen has been employed by Thomas H. Lee Partners since 1986 and currently serves as a managing director. Schoen is a citizen of Massachusetts and can be served at 191 Kings Grant Road, Weston, Massachusetts 02493.

41.    Defendant Scott M. Sperling ("Sperling") is a member of the Board of the Company. Defendant Sperling is, and at all relevant times, was a Class B Director of the Company.  Sperling is managing director of Thomas H. Lee Partners and trustee and general partner of various THL equity funds.  Additionally, Sperling is a director of Beacon Capital Partners.  Sperling is a citizen of Pennsylvania and can be served at 4 Moore Road, Sewickley, Pennsylvania 15143.

42.    Defendant Lynn C. Swann ("Swann") is a member of the Board of the Company. Defendant Swann is, and at all relevant times, was a Class A Director of the Company.   In September 2003, Wyndham entered into a two year consulting agreement with Swann.  Swann provides Wyndham with consulting services related to the development and expansion of its collegiate and professional sports marketing plans and sales initiatives.  He is required to make a certain number of personal appearances a year on Wyndham's behalf and to appear in a certain amount of advertisements to promote Wyndham.   The agreement entitles Swann to ongoing

payments of $250,000 per year. Additionally, defendant Swann was granted 100,000 restricted shares of Class A common stock upon execution of agreement. The shares vest in two equal installments in September 2004 and September 2005. Swann is a citizen of Pennsylvania and can be served at Merriman Road, Sewickley, Pennsylvania 15143.

43. Defendant Sherwood M. Weiser ("Weiser") is a member of the Board of the Company. Defendant Weiser is, and at all relevant times, was a Class A Director of the Company. Weiser holds an ownership interest in the Holiday Inn, Dayton Mall, in Dayton, Ohio. In 2004, Wyndham provided approximately $76,475 in hotel management, franchise and other services to this hotel. Weisner is a citizen of Florida and can be served at 10 Edgewater Drive, Miami, Florida 33133.

44. The defendants identified in ¶¶25-43 are sometimes collectively referred to as the "Individual Defendants."

## DEFENDANTS' FIDUCIARY DUTIES

45. Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation and its shareholders, and if such transaction will result in a change of corporate control, the corporation and its shareholders are entitled to receive a significant premium. To diligently comply with these duties, the directors and/or officers may not take any action that:

(a) adversely affects the value provided to the corporation or its shareholders;

(b) will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c) contractually prohibits themselves from complying with their fiduciary duties;

- 13 -

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation and its shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the corporation and its public shareholders.

46.     In accordance with their duties of loyalty and good faith, defendants, as directors and/or officers of Wyndham, were obligated under Delaware law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the corporation or its public shareholders; and/or

(c)     benefiting themselves at the expense or to the detriment of the corporation and its shareholders.

47.     Plaintiff alleges herein that defendants, separately and together, in connection with the Proposed Acquisition, have knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, due care, good faith, fair dealing, independence, and candor owed to Wyndham and its public shareholders. Defendants have engaged in self-dealing, and have obtained for themselves personal benefits, including personal financial benefits not shared equally by Wyndham or the Class, or have aided and abetted others who did so. As a result of defendants' self-dealing and divided loyalties, among other things, the negotiation process for the Proposed Acquisition was tainted and unfair and neither Wyndham nor the Class has received or will receive an adequate or fair process or price for their Wyndham common stock in the Acquisition.

48.     Defendants also owe the Company and its stockholders a duty of truthfulness under Delaware law, which includes the disclosure of all material facts concerning the Acquisition.

- 14 -

Defendants have knowingly or recklessly breached their fiduciary duties of candor and good faith by failing to disclose all material information concerning the Acquisition, the true value of the Company, and defendants conflicted or have aided and abetted others who did so.

49.    Because defendants have knowingly or recklessly breached their duties of loyalty, good faith, fair dealing, independence and candor in connection with the Proposed Acquisition or aided and abetted others who did so, the burden of proving the inherent or entire fairness of the Proposed Acquisition (including all aspects of its negotiation, structure, price and terms) is placed upon defendants as a matter of law.  Defendants cannot meet that burden.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action both derivatively and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Wyndham's common stock who are being and will be harmed by defendants' actions described below (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

51.    This action is properly maintainable as a class action.

52.    The Class is so numerous that joinder of all members is impracticable.  According to Wyndham's SEC filings, there were more than 172 million shares of Wyndham common stock outstanding as of May 19, 2005.

53.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)    whether defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Acquisition;

- 15 -

(b)     whether the Individual Defendants are engaging in self-dealing in connection with the Acquisition and whether the Individual Defendants are unjustly enriching themselves and other insiders;

(c)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Acquisition, including the duties of loyalty, due care, good faith, diligence, honesty, candor and fair dealing, and/or other fiduciary duties;

(d)     whether the defendants, in bad faith and for improper motives, have impeded or erected barriers to discourage other offers for the Company or its assets; and

(e)     whether Wyndham, plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

54.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

55.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

56.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

57.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

58. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

59. Plaintiff also brings this action derivatively in the right and for the benefit of Wyndham to redress injuries suffered and to be suffered by Wyndham as a direct result of the breaches of fiduciary duty, violations of law and corporate waste, as well as the aiding and abetting thereof, by the defendants.

60. Plaintiff will adequately and fairly represent the interests of Wyndham and its shareholders in enforcing and prosecuting its rights.

61. Plaintiff is an owner of Wyndham stock and was an owner of Wyndham stock during all times relevant to the defendants' wrongful course of conduct as alleged herein.

62. As a result of the facts set forth throughout this Complaint, demand on the Wyndham Board of Directors to institute this action against the officers of Wyndham and members of the Wyndham Board of Directors is not necessary because such a demand would be a futile and useless act.

(a) In order to bring this action for breaching their fiduciary duties, the members of the Wyndham Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

(b) As alleged herein at ¶¶67-70, the Board of Directors is essentially controlled by the Class B preferred shareholders through its own structure of the Board and the special voting preferences granted to Class B stockholders. Class B preferred shareholders can directly elect 11 of the 19 directors. The Apollo investors, the Beacon investors and the THL investors collectively hold

- 17 -



over 90% of the outstanding Class B shares. Currently, eight of the directors are substantially involved with one of these directors. As alleged herein, at ¶¶67-70, the Class B preferred holders maintain substantial control over the other Board members as well.

63.    The defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Wyndham's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are, therefore, not disinterested parties.

64.    Wyndham's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of monies belonging to the stockholders of Wyndham. However, due to language in the directors' and officers' liability insurance policies covering the defendants in this case, certain provisions eliminate coverage for any action brought directly by Wyndham against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Wyndham, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

65.    Plaintiff has not made any demand on shareholders of Wyndham to institute this action since such demand would be a futile and useless act for the following reasons:

(a)    Wyndham is a publicly traded company with approximately 172 million shares outstanding, and thousands of shareholders;

(b)    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## BACKGROUND ALLEGATIONS

66.     Wyndham was and is, a corporation existing under the laws of the State of Delaware, with its principle place of business in Dallas, Texas. Wyndham offers upscale and luxury hotel and resort accommodations through proprietary lodging brands and a management services division. Based in Dallas, Wyndham owns, leases, manages and franchises hotels and resorts in the United States, Canada, Mexico, the Caribbean and Europe.

67.     Wyndham has Class A common stock and Class B preferred stock. As of May 19, 2005, Wyndham had approximately 172.8 million shares of Class A common stock issued and outstanding and approximately 15.8 million shares of Class B preferred stock issued and outstanding.

68.     The Class B preferred stockholders control the Board of Directors through the structure of the Board and the special voting preferences granted to Class B stock. Wyndham's Board of Directors consists of 19 members represented by three separate classes: Class A, Class B and Class C. Class A directors consist of eight directors, who are elected by the Class A common stockholders. Class B directors consist of eight directors, who are elected by the Class B preferred stockholders. Class C directors consist of three directors, who are elected by both the Class A common stockholders and Class B preferred stockholders. Each share of the Class A stock is entitled to one vote per share while each share of the Class B stock is entitled to 11.6414 votes per share. Accordingly, the voting preference gives the Class B stockholders a majority of the votes in electing the three Class C directors. Based upon December 31, 2004 shares, Class A stockholders would have been entitled to cast 171.4 votes for Class C directors while Class B stockholders would have been entitled to cast 184.1 votes for Class C directors.

69.    As of May 2004, the following entities owned 100% of the Class B preferred stock: Apollo investors, Beacon investors, THL investors, Chase Equity Associates, L.P., CMS Investors, CKE Investors, PW Hotel I, LLC and PaineWebber Capital, Inc., Guayacan Investors, Strategic Real Estate Investors and The Bonnybrook Trust, the Franklin Trust and the Dartmouth Trust. Additionally, this group of investors owned 50.2% of the outstanding shares of Class A common stock, with an additional 9.3% of the common stock being owned by the individual directors and officers of the Company. The Apollo investors, the Beacon investors and the THL investors are the major holders of the preferred stock. Collectively they hold 91.4% of the outstanding Class B stock.

70.    Not surprisingly all eight of the Class B directors are related to either the Apollo investors, the Beacon investors or the THL investors as either officers, directors or partners and in many instances are also founding principals of the entities. Defendants Black, Rowan, Mack and Neibart are substantially involved with the Apollo investors. Defendant Leventhal is substantially involved with the Beacon investors and defendants Lee, Schoen and Sperling are substantially involved with the THL investors. As a result of this structure and the other employment and financial relationships detailed herein at ¶¶25-43, each director is beholden to the Class B preferred shareholders.

71.    Under the terms of the Proposed Acquisition, Wyndham's controlling stockholders — entities affiliated with Apollo investors, THL investors, Beacon investors, PaineWebber Capital Inc., Chase Capital Partners and Walt Disney Co. CEO Michael Ovitz – will receive $72.17 a share for their convertible preferred, *or approximately $1.16 billion*. The Proposed Acquisition will net them a profit on the $1 billion the controlling preferred shareholders invested in Wyndham in 1999, in addition to the cash dividend payment of $29,250 per year each preferred stock share has been granted since 1999.

72.     The Company's common stock holders, which receive no dividends, will share *approximately $199 million.*

73.     As of April 20, 2005, the preferred shares owned by the controlling preferred holders were convertible into 200.2 million Class A shares, which would have been cashed out at just $176 million under the terms of the Proposed Acquisition.

74.     In April 2005, the Company announced a $1.65 billion refinancing, and two weeks later announced it was undertaking a massive stock recapitalization which, if completed, would have converted all preferred stock into common stock.

75.     On April 15, 2005, the Company announced that it had entered into a definitive recapitalization agreement with certain investors in Wyndham's Series B Preferred Stock. In the recapitalization, the existing classification of Wyndham's common stock would be eliminated, all outstanding shares of Series A and Series B Preferred Stock (including accrued but unpaid dividends) would be converted into common stock and the existing common stockholders would continue to hold shares of common stock. At the closing of the transaction, the holders of the Series A and Series B preferred stock would own approximately 85% of the outstanding common stock of Wyndham and the existing common stockholders would own approximately 15% of the outstanding common stock of Wyndham.

76.     In May 2005 the Company completed the $1.65 billion refinancing of its corporate credit facilities and the majority of its outstanding mortgage debt, including extending its corporate debt maturities to 2011 (90% of Wyndham's outstanding debt) and pre-funding $100 million in capital to be invested into the Company's owned and leased properties. This was undertaken to assist the controlling preferred stock holders.

77.     Pursuant to the terms of their preferred stock issued in June 1999, preferred stock dividends were payable quarterly, on a cumulative basis, at a rate of 9.75% per year, for the first six

- 21 -



years with the dividends structured to ensure an aggregate fixed cash dividend payment of

$29,250 per year. However, Wyndham's credit facility prohibited it from paying the cash portion of

the preferred stock dividend until expiration or further amendment of its credit facility and the cash

portion of the dividend had not been paid but had accrued since 2002. As of December 31, 2004,

cash dividends totaling $102.3 million on the preferred stock had been in arrears and unpaid for a

period of more than 60 days.

78.     The first six year term of the preferred stock agreement would expire in June 2005

and from that point forward the Board, in compliance with its fiduciary duties, would have to

determine if the preferred stock should get cash or stock dividends. Moreover, in June 2005 another

provision would expire requiring that if a change in control or a liquidation of Wyndham occurred,

any accrued dividends had to be immediately accelerated and paid. Moreover, at the end of the six

year period in June 2005, the preferred stock was redeemable by Wyndham and the Board, in

compliance with its fiduciary duties would be forced to decide whether or not to redeem the

preferred stock, thus terminating the preferred dividend at a rate of 9.75% per year.

79.     In May 2005 it was reported that the Company had put itself up for sale. An article

appearing in BizNewOrleans.com dated May 11, 2005 entitled "WSJ: Wyndham International

seeking a buyer," stated in relevant part:

> Wyndham International Inc. has put itself up for sale, according to a report today by
> The Wall Street Journal.
>
> Wyndham has 142 hotels and resorts in 10 countries in its franchise system,
> including 33 it owns and leases. The company operates four hotels in the greater
> New Orleans area.
>
> The hotel chain's stock and debt are valued at about $3.7 billion. For the past
> several years, the company has been paying down debt by selling off its nonstrategic
> hotels, slashing administrative costs and refinancing its debt in order to slim itself
> down to a "branded hotel operating company" focusing on the Wyndham branded
> hotels, the Journal reported.

Wyndham, which reported earnings yesterday, had first-quarter revenue of $282.6 million and a loss of 14 cents a share. The company said it expected to complete its planned $1.65 billion debt refinancing this week, extending its corporate-debt maturities to 2011.

A Wyndham spokeswoman told the Journal: "We're not commenting on market rumors and speculation."

The Dallas-based company owns, leases, manages and franchises the Wyndham Hotels & Resorts, Wyndham Luxury Resorts, Summerfield Suites and Viva Wyndham Resorts.

80.    On May 17, 2005, Wyndham filed a Form 8-K with the Securities and Exchange

Commission (the "SEC") advising that its previously issued financial statements for fiscal 2004

could "no longer be relied upon":

### ITEM 4.02A  NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW

During the quarter ended March 31, 2005, as Wyndham International, Inc. (the "Company" or "Wyndham") was continuing to remediate internal controls over financial reporting previously disclosed in its December 31, 2004 Annual Report on Form 10-K, the Company identified an additional tax charge of $1.7 million related to 2004 and reconsidered other previously identified but deemed immaterial adjustments related primarily to accruals of unbilled legal and consulting fees aggregating $1.8 million related to 2004. The Company's Audit Committee and management consider the charges to be immaterial to the Company's financial position and the results of operations for the year ended December 31, 2004. *However, even though the adjustments are only 0.14% of the first quarter 2005 total assets, 0.15% of total liabilities, 2.5% of shareholders' equity and 1.2% of the first quarter 2005 total revenues, the $3.5 million adjustments as a percentage of the first quarter 2005 loss from continuing operations of $48,000 are significant. As a result, on May 11, 2005 it was determined that the financial statements for the year ended December 31, 2004 should no longer be relied upon.*

The restatement resulted in the Company adjusting its previously reported 2004 net loss of $509.5 million ($4.01 per share) to net loss of $512.9 million ($4.03 per share).

81.    On May 17, 2005, the Company also amended its previously filed Form 10-K for the

fiscal year ending December 31, 2004, indicating that the 10-K had not been updated based on the

review conducted and that only the limited changes had been made as outlined in the preceding

paragraph:

- 23 -

This amended Annual Report on Form 10-K/A has not been updated except as required to reflect the effects of the foregoing restatement. In order to preserve the nature and character of the disclosures set forth in such items as originally filed, no attempt has been made in this amendment to modify or update the disclosures in the original Annual Report on Form 10-K except for the foregoing restatement. *As a result, this amended Annual Report on Form 10-K/A contains forward-looking information which has not been updated for events subsequent to the date of the original filing, and all information contained in this amended Annual Report on Form 10-K/A and the original Annual Report on Form 10-K is subject to updating and supplementing as provided in the periodic reports that the Company has filed and/or will file with the SEC after the original filing date of the Annual Report on Form 10-K.*

82.     On May 24, 2005, the fiscal 2004 10-K was once again amended to add the report of Wyndham's independent accountants made in connection with the restatement:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders
Wyndham International, Inc.:

We have completed an integrated audit of Wyndham International Inc.'s 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States). Our opinions, based on our audits, are presented below.

*        *        *

As described in Note 2b to the consolidated financial statements, the Company has restated its 2004 consolidated financial statements.

**Internal control over financial reporting**

Also, we have audited management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, *that Wyndham International Inc. did not maintain effective internal control over financial reporting as of December 31, 2004, because Wyndham International, Inc. did not maintain effective controls over the accounting and review of income taxes and the determination of deferred income taxes and the related valuation allowance,* based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit.

*     *     *

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weakness has been identified and included in management's assessment. As of December 31, 2004, Wyndham International, Inc. did not maintain effective controls over the accounting and review of income taxes and the determination of deferred income taxes and the related valuation allowance. Specifically, the Company did not maintain effective controls over the reconciliation of its income tax assets and liabilities to the underlying differences between the tax basis and accounting basis of each component of the Company's balance sheet. In addition, the related income tax asset valuation allowance was not reconciled to the underlying supporting detail. This control deficiency resulted in an audit adjustment to the fourth quarter 2004 consolidated financial statements. For the quarter ended March 31, 2005, the Company identified an additional adjustment of a write-off of income tax receivable related to 2004, which resulted in the restatement of the 2004 financial statements described in Note 2b. ***Additionally, this control deficiency could result in a misstatement of income taxes payable, deferred income tax assets and liabilities and the related income tax provision that could result in a material misstatement to the annual or interim financial statements that would not be prevented or detected.*** Accordingly, management determined that this control deficiency constitutes a material weakness.

*     *     *

/s/ PricewaterhouseCoopers LLP
Dallas, Texas

March 15, 2005 with respect to our opinion relating to the consolidated financial statements and financial statement schedules, except for Note 2b to the consolidated financial statements related to accounting for income taxes, as to which the date is May 16, 2005, and April 8, 2005 with respect to our opinions relating to internal control over financial reporting, except for the penultimate paragraph of Management's Report on Internal Control Over Financial Reporting, as to which the date is May 16, 2005.

83.     The preferred stock reorganization was never undertaken after the credit agreement was renegotiated and instead defendants agreed to the terms of the Proposed Acquisition which unfairly prefers the interests of the preferred shareholders to those of the minority common stock holders.

84.     Several other potential buyers approached expressed interest in purchasing Wyndham, including Goldman, Sachs & Co.'s Whitehall Street Real Estate Funds, represented by

Joseph Frumkin and Anthony Colletta of Sullivan & Cromwell LLP; Marriott International Inc.; and

a consortium of Starwood Hotels & Resorts Worldwide Inc. and Morgan Stanley.

## DEFENDANTS ANNOUNCE THE PROPOSED ACQUISITION

85.    On June 14, 2005, the Company issued a press release entitled, "Wyndham

International, Inc. Announces Agreement to Be Acquired by The Blackstone Group for $1.15 Per

Share or Approximately $3.24 Billion."  The press release stated in relevant part:

> Wyndham International, Inc. announced today that it has entered into a definitive Merger Agreement to be acquired by an affiliate of The Blackstone Group in a transaction valued at $3.24 billion.
>
> Under the terms of the Merger Agreement, Blackstone will acquire all of the outstanding Common Stock of Wyndham for $1.15 per share in cash.  The board of directors of Wyndham unanimously approved the Merger Agreement and recommended approval by its shareholders.
>
> Fred J. Kleisner, Wyndham's chairman, president and chief executive officer, said, "Wyndham has followed a strategic approach to: simplify our corporate structure, refinance our debt and sell all non-strategic assets.  We have created a stream-lined organization centered around 32 high quality owned and leased hotels and destination resorts plus the world's pre-eminent spa, the Golden Door.  All of this has made Wyndham a much desired and sought after company in today's real estate market.  In that regard, we are pleased to have signed a merger agreement with Blackstone."
>
> Jonathan D. Gray, senior managing director of The Blackstone Group, said, "We are excited to acquire Wyndham International with its terrific collection of employees, properties and brands.  We look forward to working with Wyndham's franchisees, owners and partners."
>
> The completion of the Merger Agreement is subject to various customary closing conditions, including the approval of Wyndham's stockholders and the expiration of the applicable waiting period under the Hart-Scott-Rodino Act. Completion of the Merger Agreement is not subject to the receipt of financing by Blackstone.  The closing of the Merger Agreement is expected to occur during the fourth quarter of 2005.
>
> Wyndham previously announced the entry into a definitive Recapitalization Agreement with certain investors of Wyndham's Series B Preferred Stock in which all outstanding shares of Series A and Series B Preferred Stock would be converted into common stock.  Under the terms of the Merger Agreement, the holders of shares of Preferred Stock will receive $72.17 per share in cash, subject to potential adjustment to reflect additional shares that may be issued as dividends after June 30, 2005.



Bear, Stearns & Co. Inc. acted as financial advisor to Wyndham in connection with the strategic review and this transaction. J.P. Morgan Securities Inc. provided a fairness opinion in connection with this transaction. Paul, Weiss, Rifkind, Wharton & Garrison LLP acted as legal advisor to Wyndham. Simpson Thacher & Bartlett LLP acted as legal advisor to Blackstone.

86.     On June 14, 2004, the Apollo investors, the Beacon investors and the THL investors, holders of over 90% of the Class B preferred stock, entered into a voting agreement with Blackstone and Wyndham whereby they agreed to vote their shares in favor of the merger. Eight of the directors are substantially involved with one of these entities.

87.     Defendants have breached their fiduciary duties by failing to provide material disclosures to Wyndham's public shareholders prior to the announcement of the Proposed Acquisition, thus putting an artificial cap on the Company's common stock and preventing the full value of Wyndham's common stock from being realized. Specifically, defendants have refused to disclose the full extent of their negotiations with alternate potential acquirers, whether alternative offers were formally proposed, what the terms of alternative offers were, and whether the terms of alternative offers would have provided more value to Wyndham's non-affiliated shareholders. Defendants have also concealed any additional effects the restatement and investigation concerning its inadequate internal controls revealed. Finally, defendants have concealed the favorable financial results of Wyndham's second quarter of 2005 which ended on May 31, 2005, a full two weeks prior to the announcement of the Proposed Acquisition.

88.     Bear Stearn & Co. ("Bear Stearns") was retained by the Wyndham Board to serve as its financial advisor. However, Bears Stearns' own significant interest in seeing the transaction close, regardless of the fairness of the terms and price to Wyndham and its non-affiliated shareholders, and its extensive long-term relationships with Blackstone, Wyndham's executives and the Apollo investors and other preferred holders prevented it from fulfilling its fiduciary duties to Wyndham and its unaffiliated shareholders.

89.     In 1999, Bear Stearns advised an investor group led by an entity affiliated with the Apollo investors when it initially invested $1 billion in Wyndham. Bear Stearns went on to advise Wyndham, at the behest of the Company's management and the preferred holder directors, in various divestitures of what bankers describe as "nonproprietary branded properties," usually about 20 hotels at a time. Bear Stearns earned tens of millions of dollars in investment banking fees along the way.

90.     Bear Stearns is also well acquainted with Blackstone, having worked on several of its hotel company deals during 2004. Bear Stearns advised Blackstone in its $1.23 billion acquisition of Boca Resorts Inc. and its $3.1 billion purchase of Extended Stay America Inc. For the Extended Stay deal, Bear Stearns also provided financing. Bear Stearns advised the seller of Prime Hospitality Corp. when Blackstone purchased it for $790 million.

91.     J.P. Morgan Securities provided the Wyndham Board with a fairness opinion in a deal that too only paid if J.P. Morgan found the terms and price of the Proposed Acquisition were fair. J.P. Morgan has close ties to Blackstone and the preferred investors group as well. J.P. Morgan just advised on and co-underwrote Blackstone's bid for Wind, the telecoms arm of Italian utility Enel, in April 2005. J.P. Morgan also served as a lead arranger in Blackstone's November 2004 secondary buyout (505 million EURO debt financed purchase) of Gerresheimer Glas. In September 2004, it was announced that J.P. Morgan and Apollo had agreed to buy AMC Entertainment for $2 billion. In fact, Blackstone, J.P. Morgan and the Apollo investors are all three Second Secured Lenders to German company PrimaCom AG and in January 2005 they obtained an injunction from a German court permanently enjoining PrimaCom AG's planned sale of its subsidiary, Multikabel, stating the terms were unfair to them as creditors of PrimaCom AG. In September 2003, Blackstone and Apollo bought Ondeo Nalco Co., the U.S. water treatment arm of Franco-Belgian conglomerate Suez SA, for $4.35 billion and J.P. Morgan served as Apollo's advisor. When Wyndham sold 23 hotels to

a private investment fund in March 2005 for $366 million, Bear Stearns and J.P. Morgan advised Wyndham.

92.     Blackstone has only committed to a $550 million equity investment in Wyndham, with Bear Stearns, along with Wachovia Bank, N.A., committing to provide the other $2.8 billion in debt financing needed to complete the Proposed Acquisition.

93.     J.P. Morgan and Bear Stearns were joint book runners on the Company's May 2005 $1.65 billion refinancing of its corporate credit facilities and the majority of its outstanding mortgage debt, including extending its corporate debt maturities to 2011 (90% of Wyndham's outstanding debt) and pre-funding $100 million in capital to be invested into the Company's owned and leased properties.

94.     Under the terms of their engagements to provide financial advising services to Wyndham in connection with the Proposed Acquisition, the fees of J.P. Morgan and Bear Stearns would both be significantly limited if they concluded the terms of the Proposed Acquisition were not fair to Wyndham and its public shareholders.

## SELF-DEALING

95.     By reason of their positions with Wyndham, the Individual Defendants are in possession of non-public information concerning the financial condition and prospects of Wyndham, and especially the true value and expected increased future value of Wyndham and its assets, which they have not disclosed to Wyndham's public stockholders. Moreover, the defendants have clear and material conflicts of interest and are acting to better their own interests at the expense of Wyndham's public shareholders.

96.     The proposed sale is wrongful, unfair and harmful to Wyndham and Wyndham's public stockholders, and represents an effort by defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Wyndham and the Class members. The

Acquisition is an attempt to deny Wyndham and the members of the Class their rights while usurping the same for the benefit of the Individual Defendants on unfair terms.

97.    In particular, defendants' caused Wyndham to misstate its financial results, operate without internal controls, expend millions of dollars on professional and legal fees structuring the refinancing for the benefit of the preferred stock holders and have agreed to terms of the Proposed Acquisition (and refused to negotiate in good faith with other potential acquirers) only to benefit the preferred shareholders rather than redeeming and/or canceling the preferred stock.

98.    In light of the foregoing, the Individual Defendants must, as their fiduciary obligations require:

- Withdraw their consent to the sale of Wyndham and allow the shares to trade freely – without impediments.

- Act independently so that the interests of Wyndham' public stockholders will be protected, including, but not limited to, the retention of truly independent advisors and/or the appointment of a truly independent Special Committee.

- Fully and fairly disclose all additional information to shareholders on the merger and the true value of the Company.

- Adequately ensure that no conflicts of interest exist between defendants' own interests and their fiduciary obligation to maximize stockholder value or, if such conflicts exist, to ensure that all conflicts be resolved in the best interests of Wyndham' public stockholders.

### FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties

99.    Plaintiff repeats and realleges each allegation set forth herein.

100.    The defendants have violated the fiduciary duties of care, loyalty, good faith, candor and independence owed under applicable law to Wyndham and its public shareholders and have acted to put their personal interests ahead of the interests of Wyndham and its public shareholders.

101.   By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, are attempting to advance their interests at the expense of Wyndham and the Class.

102.   The Individual Defendants have violated their fiduciary duties by entering into a transaction with Blackstone without regard to the fairness of the transaction to Wyndham and its shareholders.

103.   The Individual Defendants have also violated their fiduciary duties by failing to provide Wyndham and its public shareholders with material disclosures concerning the Proposed Acquisition.

104.   As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Wyndham and its shareholders because, among other reasons:

(a)   they failed to properly value Wyndham;

(b)   they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships or connection with the Proposed Acquisition; and

(c)   they failed to provide Wyndham and its public shareholders with material disclosures concerning the Proposed Acquisition.

105.   Because the Individual Defendants dominate and control the business and corporate affairs of Wyndham, and are in possession of private corporate information concerning Wyndham's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them, the Company and the public shareholders of Wyndham which makes it inherently unfair for them to pursue any proposed transaction wherein they will reap disproportionate benefits.

106. By reason of the foregoing acts, practices and course of conduct, the defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Wyndham and the Class.

107. As a result of the actions of defendants, Wyndham and the Class will suffer irreparable injury as a result of defendants' self-dealing.

108. Unless enjoined by this Court, the defendants will continue to breach their fiduciary duties owed to Wyndham and the Class, and may consummate the Proposed Acquisition which will waste Wyndham's corporate assets and exclude the Class from its fair share of Wyndham's valuable assets and businesses, and/or benefit defendants in the unfair manner complained of herein, all to the irreparable harm of Wyndham and the Class, as aforesaid.

109. Defendants are engaging in self-dealing, are not acting in good faith toward Wyndham and the Class, and have breached and are breaching their fiduciary duties to Wyndham and the Class.

110. Unless the Proposed Acquisition is enjoined by the Court, defendants will continue to breach their fiduciary duties owed to Wyndham and the Class, will not engage in arm's-length negotiations on the Proposed Acquisition terms, and will not supply to Wyndham's minority stockholders sufficient information to enable them to cast informed votes on the Proposed Acquisition and may consummate the Proposed Acquisition, all to the irreparable harm of Wyndham and the Class.

111. Wyndham, plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Wyndham and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

### Abuse of Control

112.    Plaintiff repeats and realleges each allegation set forth herein.

113.    The defendants' conduct constituted an abuse of their ability to control and influence Wyndham for which they are legally responsible.

114.    As a proximate result thereof, Wyndham has been damaged and will continue to suffer damages, and has sustained and will continue to sustain substantial damage.

## THIRD CAUSE OF ACTION

### Gross Mismanagement

115.    Plaintiff repeats and realleges each allegation set forth herein.

116.    As detailed more fully herein, the defendants each have and had a duty to Wyndham and its shareholders to prudently supervise, manage and control Wyndham's operations.

117.    The defendants by their actions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets of Wyndham in a manner consistent with the operations of a publicly held corporation.

118.    As a proximate result thereof, Wyndham has been damaged and will continue to suffer damages, and has sustained and will continue to sustain substantial damage.

## FOURTH CAUSE OF ACTION

### Waste of Corporate Assets

119.    Plaintiff repeats and realleges each allegation set forth herein.

120.    As a result of the foregoing conduct, the defendants have caused Wyndham to waste valuable assets.

121.    As a proximate result thereof, Wyndham has been damaged and will continue to suffer damages, and has sustained and will continue to sustain substantial damage.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and derivatively on behalf of Wyndham, demands judgment and preliminary and permanent injunctive relief in the favor of Wyndham and in favor of the Class and against defendants as follows:

A.     Declaring that, as to the First Cause of Action, this action is properly maintainable as a class action;

B.     Declaring that this is a proper derivative action against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, abuse of control, gross mismanagement and waste of corporate assets;

C.     Declaring and decreeing that the Proposed Acquisition agreement was entered into in breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

D.     Enjoining defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until they adopt and implement a procedure or process to obtain the highest possible price for Wyndham and its shareholders;

E.     Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Wyndham and its shareholders;

F.     Rescinding, to the extent already implemented, the Proposed Acquisition or any of the terms thereof;

G.     Imposition of a constructive trust, in favor of Wyndham, upon any benefits improperly received by defendants as a result of their wrongful conduct;

H.     Awarding Wyndham restitution from defendants, and each of them;

- 34 -

I.      Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

J.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  June 29, 2005                    PROVOST & UMPHREY LAW FIRM, LLP
                                         JOE KENDALL
                                         State Bar No. 11260700
                                         WILLIE C. BRISCOE
                                         State Bar No. 24001788


                                         _____
                                         JOE KENDALL

                                         3232 McKinney Avenue, Suite 700
                                         Dallas, TX  75204
                                         Telephone: 214-744-3000
                                         214-744-3015 (fax)

                                         LERACH COUGHLIN STOIA GELLER
                                           RUDMAN & ROBBINS LLP
                                         DARREN J. ROBBINS
                                         RANDALL J. BARON
                                         A. RICK ATWOOD, JR.
                                         SHAUN L. GROVE
                                         401 B Street, Suite 1600
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)

                                         Attorneys for Plaintiff

S:\CptDraft\Derivative\Cpt Wyndham.doc

- 35 -

## VERIFICATION

I, Randall J. Baron, declare as follows:

1.      I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 27th day of June, 2005, at San Diego, California.

RANDALL J. BARON



**CIVIL COVER SHEET**

§JS 44 (Rev 11/04)

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Alaska U.F.C.W. Pension Trust, on Behalf of Itself and All Others Similarly Situated, Derivatively on Behalf of Wyndham International | Fred J. Kleisner, Karim A. Alibhai, Marc Meilinson, Leon D. Black, Leonard Boxer, Adela Cepeda, Milton Fine, Lee S. Hillman, et al |

 JUN 30 2005 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF TEXAS

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____ Dallas
(IN U.S. PLAINTIFF CASES ONLY)

NOTE IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

(c) Attorney's (Firm Name, Address, and Telephone Number)
Provost Umphrey Law Firm LLP, 3232 McKinney Avenue, Suite 700, Dallas, Texas 75204 Telephone: 214-744-3000

Attorneys (If Known)

**3-05CV1323-B**

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U S Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U S Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl Ret Inc Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U S Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity).

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P 23

DEMAND $ _____

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE 6/29/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG JUDGE _____