UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| ALASKA U.F.C.W. PENSION TRUST, on Behalf of Itself and All Others Similarly Situated, | § § § § | Civil Action No. 3:05-cv-1323-B |
| | | CLASS ACTION |
| Plaintiff, | § § § | |
| vs. | § § | |
| FRED J. KLEISNER, KARIM A. ALIBHAI, MARC BEILINSON, LEON D. BLACK, LEONARD BOXER, ADELA CEPEDA, MILTON FINE, LEE S. HILLMAN, THOMAS H. LEE, ALAN M. LEVENTHAL, WILLIAM L. MACK, LEE S. NEIBART, MARC J. ROWAN, ROLF E. RUHFUS, LAWRENCE RUISI, SCOTT A. SCHOEN, SCOTT M. SPERLING, LYNN C. SWANN and SHERWOOD M. WEISER, | § § § § § § § § § § § § § § | |
| Defendants. | § § | DEMAND FOR JURY TRIAL |

AMENDED CLASS ACTION COMPLAINT

1.      This is a shareholder class action brought against the members of the Board of

Directors of Wyndham International, Inc. ("Wyndham" or the "Company") on behalf of the

Company's former public shareholders for breach of fiduciary duty arising out of defendants'

attempts to provide certain Wyndham insiders and directors with preferential treatment in connection

with their efforts to complete the sale of Wyndham to The Blackstone Group ("Blackstone") for

$1.15 per share in cash for each share of Wyndham common stock (the "Acquisition").

## SUMMARY OF THE ACTION

2.      In April 2005, the Company announced a $1.65 billion refinancing, and two weeks

later announced it was undertaking a massive stock recapitalization which, if completed, would have

converted all preferred stock into common stock.

3.      On April 15, 2005, the Company announced that, based upon the recommendation of

the special committee formed to review and negotiate a change to the Company's capital structure, it

had entered into a definitive recapitalization agreement with certain investors in Wyndham's Series

A and B Preferred Stock (the "Recapitalization").  In the Recapitalization, the existing classification

of Wyndham's common stock would be eliminated, all outstanding shares of Series A and Series B

Preferred Stock (including accrued but unpaid dividends) would be converted into common stock

and the existing common stockholders would continue to hold shares of common stock.  At the

closing of the transaction, the holders of the Series A and Series B preferred stock would own

approximately 85% of the outstanding common stock of Wyndham and the existing common

stockholders would own approximately 15% of the outstanding common stock of Wyndham.

4.      In May 2005 the Company completed the $1.65 billion refinancing of its corporate

credit facilities and the majority of its outstanding mortgage debt, including extending its corporate

debt maturities to 2011 (90% of Wyndham's outstanding debt) and pre-funding $100 million in

- 1 -

capital to be invested into the Company's owned and leased properties.  This was undertaken to assist the controlling preferred stock holders.

5.      The first six year term of the preferred stock agreement would expire in June 2005 and from that point forward the Board, in compliance with its fiduciary duties, would have to determine if the preferred stock should get cash or stock dividends.  Moreover, in June 2005 another provision would expire requiring that if a change in control or a liquidation of Wyndham occurred, any accrued dividends had to be immediately accelerated and paid.  Moreover, at the end of the six year period in June 2005, the preferred stock was redeemable by Wyndham and the Board, in compliance with its fiduciary duties would be forced to decide whether or not to redeem the preferred stock, thus terminating the preferred dividend at a rate of 9.75% per year.

6.      The Recapitalization was never undertaken after the credit agreement was renegotiated.  Rather than follow the advice of the only special committee created to determine what was fair to Wyndham's minority shareholders, defendants agreed to the terms of the Acquisition which unfairly benefited the interests of the preferred shareholders to the detriment of the minority common stock holders.

7.      On June 14, 2005, Wyndham announced that its Board of Directors (the "Board") had entered into an agreement with Blackstone wherein Blackstone would acquire all outstanding Class A common stock of Wyndham and all Class A and B preferred stock in a transaction valued at approximately $3.24 billion, including assuming $1.8 billion in debt, pursuant to terms which substantially benefited the preferred shareholders to the detriment of Wyndham's common shareholders.

8.      The holders of the preferred stock, led by Wyndham directors affiliated with Apollo Management, L.P. (the "Apollo investors"), Beacon Capital Partners, Inc. (the "Beacon investors") and Thomas H. Lee Partners (the "THL investors"), PaineWebber Capital Inc., Chase Capital

Partners and Walt Disney Co. CEO Michael Ovitz, received approximately $1.19 billion, or ***$72.17 per share***.  The Acquisition netted them a substantial profit on the $1 billion the controlling preferred shareholders invested in Wyndham in 1999, in addition to the cash dividend payment of $29,250 per year that each preferred stock share had been granted since 1999.[1]  The preferred shareholders enjoy an insurmountable voting advantage over the common stock holders as alleged herein.  As a result, the Acquisition is subject to the entire fairness standard of review which, as explained herein, defendants cannot meet.

9.      The Company's minority shareholders, the Class A common shareholders – who received no dividends – were forced to accept the remaining $250 million, or ***$1.15 per share***.

10.     Bear, Stearns & Co., Inc. ("Bear Stearns"), which has long and lucrative history with both Wyndham and Blackstone, was initially engaged by defendants to act as the Company's financial advisor in connection with any sale of the Company or other strategic alternative.  On February 16, 2005, during a Board meeting, Bear Stearns was asked to provide financing to potential purchasers of the Company, in addition to its role as the Company's financial advisor.  Defendants permitted Bear Stearns to finance the Acquisition, negotiate the Acquisition on behalf of Wyndham and advise the Board on the fairness of the Acquisition despite the conflict of interest created by its dual role as financial advisor to the Company and financing source for the third-party Acquisition of the Company.  As the financing source for the Acquisition, Bear Stearns had a strong incentive to

---

[1]     Pursuant to the terms of the preferred stock issued in June 1999, preferred stock dividends were payable quarterly, on a cumulative basis, at a rate of 9.75% per year, for the first six years with the dividends structured to ensure an aggregate fixed cash dividend payment of $29,250 per year.  However, Wyndham's credit facility prohibited it from paying the cash portion of the preferred stock dividend until expiration or further amendment of its credit facility and the cash portion of the dividend had not been paid but had accrued since 2002.  As of December 31, 2004, cash dividends totaling $102.3 million on the preferred stock had been in arrears and unpaid for a period of more than 60 days.

decrease or downplay the value for which the Company was ultimately sold to minimize its financing risks.

11.     Although they ultimately disclosed the financial projections underlying the fairness opinion, in hopes of coaxing the Company's minority shareholders into going away quietly, defendants nevertheless disseminated a false and materially misleading Proxy Statement (the "Proxy") on July 20, 2005, which misrepresented and/or omitted material information concerning the Acquisition necessary to ensure a fully-informed shareholder vote, including, among other things:  (i) defendants' reasons for considering the Acquisition to be a "change of control" for purposes of employment compensation benefits but not for purposes of preferred stock liquidation preferences; (ii) defendants' reasons for not appointing a special committee to consider the Acquisition given the substantial conflicts of interest of the members of the Board and Bear Stearns; (iii) information regarding the steps taken by the Board to protect shareholders from the conflicts of interest suffered by Bear Stearns; (iv) information regarding the director defendants' stock options and restricted stock units; (v) the favorable financial results of Wyndham's second quarter of 2005 prior to the announcement of the Acquisition; (vi); information as what percentage, if any, of the fee paid to J.P. Morgan Securities, Inc. ("JP Morgan") was contingent upon consummation of the Acquisition; (vii) information underlying the analyses substantiating J.P. Morgan's fairness opinion; (viii) information regarding the purpose and distribution of the $4 million "bonus pool" established in connection with the Acquisition; (ix) defendants' reasons for not employing a "majority of the minority" voting structure for approval of the Acquisition; (x) any effects the restatement and investigation concerning the Company's inadequate internal controls revealed; and (xi) information as to whether any separate consideration was paid to the holders of the preferred stock, or anyone else, for entering into the agreement with Blackstone to vote all of their shares in favor of the Acquisition (the "Voting Agreement") – which ensured that nearly 53% of the vote was locked-up.

12.     In pursuing the unlawful plan to cash out Wyndham's public stockholders for grossly inadequate consideration, and pursuant to grossly inadequate terms and disclosures, each of the defendants violated applicable laws by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, candor, independence, good faith and fair dealing.  The Wyndham Board is not disinterested and is riddled with conflict, including the fact that the Class B preferred stockholders and specifically the Apollo investors, the Beacon investors and the THL investors, control the Board of Directors through their voting stock.

13.     The preferred stockholders used their control to negotiate a sale of Wyndham that disposes of Wyndham at a price and pursuant to terms which benefit preferred holders to the detriment of common stockholders.  Moreover, as part of the Agreement and Plan of Merger by and between Wyndham and Blackstone (the "Merger Agreement"), defendants agreed to provisions which all but precluded a better offer from materializing, including unlawful "no-solicitation" and termination fee provisions.

14.     The defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Wyndham's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are, therefore, not disinterested parties.  Defendants' ongoing pattern of misconduct and egregious breaches of fiduciary duty in connection with the Acquisition have caused severe injury to Wyndham's former shareholders.  Only via this action can redress be obtained for the Company's former minority shareholders.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction under 15 U.S.C. §77p(d)(1)(A) and 28 U.S.C. §1332(a)(2) because complete diversity exists between the plaintiff and each defendant, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer

jurisdiction on this Court that it would not otherwise have.  This Court has personal jurisdiction over defendants because they either reside within this District and/or engaged in conduct that had a substantial impact within this District.

16.     Venue is proper under 28 U.S.C. §1391(a) because one or more defendants either resides in or maintains executive offices in this District, many of the acts and transactions complained of herein occurred in this District and defendants conduct business in this District.

## THE PARTIES

17.     Plaintiff Alaska U.F.C.W. Pension Trust is, and at times relevant to the allegations raised herein was, the owner of shares of Wyndham common stock.  Plaintiff is a citizen of Alaska.

18.     Nominal party Wyndham International, Inc. is a Delaware corporation and has its principal place of business located at 1950 Stemmons Freeway, Suite 6001, Dallas, Texas  75207.

19.     Defendant Fred J. Kleisner ("Kleisner") is, and at all relevant times, was a Class A Director of the Company.  He is also the Chairman, President and Chief Executive Officer of the Company.  Despite his glaring conflicts, including the millions of dollars he received in change of control benefits, the Board permitted Kleisner to lead the negotiations, along with Bear Stearns, on behalf of the Company.  Kleisner has served as Chairman of the Board since October 13, 2000 and as Chief Executive Officer since March 27, 2000.  From July 1999 to October 2000, defendant Kleisner served as President, and from July 1999 to March 2000, Kleisner also served as Chief Operating Officer.  In 2004, Kleisner received $1.75 million in salary and bonus, including $500,000 of a $2 million retention bonus.  Pursuant to his employment agreement, Wyndham has made several loans to Kleisner.  In 1999, the Company loaned him $500,000.  The Company loaned him an additional $665,000 in 2001.  As of December 31, 2004, $1,219,000 in principal and accrued interest remained outstanding on these loans.  Kleisner is a citizen of Texas and can be served at 3510 Turtle Creek Blvd., Apt. 17A, Dallas, Texas  75219.

20.     Defendant Karim A. Alibhai ("Alibhai") is a member of the Board of the Company. Alibhai is, and at all relevant times, was a Class A Director of the Company.  Alibhai served as a member of the special committee that reviewed and negotiated the Recapitalization.  As a result of the Acquisition, Alibhai's 30,000 stock options immediately vested.  Alibhai previously served as Wyndham's President and Chief Operating Officer from 1997 until May of 1999.  Defendant Alibhai holds an ownership interest in three Wyndham hotels.  In 2004, Wyndham provided over $1.3 million worth of hotel management, franchise and other services to these hotels.  Additionally, Alibhai is a principal of the Gencom Group.   On December 22, 2004, Wyndham sold six Summerfield Suites hotels and a 33% interest in the Summerfield brand for $104 million to Sum Business Holdings, LLC.   Sum Business Holdings is indirectly owned by Gencom American Hospitality, Inc., which is controlled by Alibhai and his family.  Alibhai is a citizen of Texas and can be served at 5910 Laguna Falls Court, Houston, Texas  77041.

21.     Defendant Marc Beilinson ("Beilinson") is a member of the Board of the Company. Defendant Beilinson is, and at all relevant times, was a Class C Director of the Company.  Beilinson served as a member of the special committee that reviewed and negotiated the Recapitalization.  As a result of the Acquisition, Beilinson's 29,998 stock options immediately vested.  Beilinson is a citizen of California and can be served at 1871 Michael Lane, Pacific Palisades, California. 90272.

22.     Defendant Leon D. Black ("Black") is a member of the Board of the Company. Black is, and at all relevant times, was a Class B Director of the Company.  He is also a Senior Partner of Apollo Management, LP.  Defendant Black is one of the founding principals of Apollo Advisors, LP.  Apollo and Wyndham have an ongoing relationship in that Apollo owns and operates several Wyndham hotels that generated approximately $3 million in management, franchise and service fees in 2004.  Apollo holds the majority of Wyndham's preferred stock.  As a result of the

Acquisition, Black's 22,500 stock options immediately vested.  Black is a citizen of New York and can be served at 760 Park Avenue, #3, New York, New York  10021.

23.      Defendant Leonard Boxer ("Boxer") is a member of the Board of the Company. Defendant Boxer is, and at all relevant times, was a Class A Director of the Company.  Boxer served as a member of the special committee that reviewed and negotiated the Recapitalization.  As a result of the Acquisition, Boxer's 125,433 stock options, as well as his 172,212 deferred unit awards immediately vested.  Boxer has served as a partner and chairman of the real estate department of the law firm of Stroock & Stroock & Lavan LLP.  In 2004, Wyndham retained Stroock & Stroock & Lavan to advise the Company on numerous property transactions.  During 2004, Wyndham paid Stroock & Stroock & Lavan approximately $352,000 in fees and Strook & Strook & Lavan has a *bona fide* expectation of receiving continuing business from the combined entity.  Boxer is a citizen of New York and can be served at 875 Park Avenue, #5D, New York, New York  10021.

24.      Defendant Adela Cepeda ("Cepeda") is a member of the Board of the Company. Defendant Cepeda is, and at all relevant times, was a Class A Director of the Company.  Cepeda served as a member of the special committee that reviewed and negotiated the Recapitalization.  As a result of the Acquisition, Cepeda's 41,247 options immediately vested.  Cepeda is a citizen of Illinois and can be served at 5016 South Greenwood Avenue, Chicago, Illinois 60615.

25.      Defendant Milton Fine ("Fine") is a member of the Board of the Company. Defendant Fine is, and at all relevant times, was a Class A Director of the Company.  Fine was the co-founder of Interstate Hotels Company in 1961.  He previously served as Chairman of Interstate prior to its being acquired by Wyndham in 1998.  Pursuant to a shareholders agreement dated December 2, 1997 between defendant Fine and Wyndham's predecessor in interest Patriot, Wyndham must indemnify Fine for certain tax liabilities until December 2, 2007.  During the first quarter of 2005, Wyndham paid $378,464 to certain entities related to Fine in consideration for Fine

releasing Wyndham from any continuing liability under a shareholders agreement. Additionally, Fine holds an ownership interest in two Wyndham hotels. In 2004, Wyndham provided approximately $844,188 in hotel management, franchise and other services to these hotels. As a result of the Acquisition, Fine's 22,500 stock options immediately vested. Fine is a citizen of Pennsylvania and can be served at 145 Old Mill Road, Pittsburgh, Pennsylvania 15238.

26.    Defendant Lee S. Hillman ("Hillman") is a member of the Board of the Company. Defendant Hillman is, and at all relevant times, was a Class C Director of the Company. As a result of the Acquisition, Hillman's 7,499 stock options immediately vested. Hillman is a citizen of Illinois and can be served at 328 Shoreline Court, Glenco, Illinois 60022.

27.    Defendant Thomas H. Lee ("Lee") is a member of the Board of the Company. Defendant Lee is, and at all relevant times, was a Class B Director of the Company. Lee founded Thomas H. Lee Company in 1974 and since then has served as its President. In 1999, the Company changed its name to the Thomas H. Lee Partners. Since 1999 Lee has served as Chairman and CEO of Thomas H. Lee Partners and as President of Thomas H. Lee Capital. As a result of the Acquisition, Lee's 22,500 stock options immediately vested. Lee is a citizen of Massachusetts and can be served at Thomas H. Lee Company, 100 Federal Street, 35th Floor, Boston, Massachusetts 02110.

28.    Defendant Alan M. Leventhal ("Leventhal") is a member of the Board of the Company. Defendant Leventhal is, and at all relevant times, was a Class B Director of the Company. Leventhal is Chairman and Chief Executive Officer of Beacon Capital Partners, Inc. Beacon presently holds Wyndham preferred stock. As a result of the Acquisition, Leventhal's 22,500 stock options immediately vested. Leventhal is a citizen of Massachusetts and can be served at 18 Pine Road, Chestnut Hill, Massachusetts 02467.

29.     Defendant William L. Mack ("Mack") is a member of the Board of the Company. Defendant Mack is, and at all relevant times, was a Class B Director of the Company. He is also a senior partner and one of the founding principals of Apollo Real Estate Advisors, LP. As a result of the Acquisition, Mack's 22,500 stock options immediately vested. Mack is a citizen of New York and can be served at Apollo Real Estate Advisors, Two Manhattenville Road, 2nd Floor, Purchase, NY 10577.

30.     Defendant Lee S. Neibart ("Neibart") is a member of the Board of the Company. Defendant Neibart is, and at all relevant times, was a Class B Director of the Company. He is also a senior partner and one of the founding principals of Apollo Real Estate Advisors, LP. As a result of the Acquisition, Neibart's 22,500 stock options immediately vested. Neibart is a citizen of New York and can be served at 10 Beech Hill Lane, Pound Ridge, New York 10576.

31.     Defendant Marc J. Rowan ("Rowan") is a member of the Board of the Company. Defendant Rowan is, and at all relevant times, was a Class B Director of the Company. Rowan, as a member of the Company's capital committee, participated in negotiations in connection with the Acquisition – ensuring that Apollo Advisors, LP interests were well protected. Rowan is also a senior partner and one of the founding principals of Apollo Advisors, LP. Rowan is a citizen of New York and can be served at 1601 Deerfield Road, Water Mill, New York 11976.

32.     Defendant Rolf E. Ruhfus ("Ruhfus") is a member of the Board of the Company. Defendant Ruhfus is, and at all relevant times, was a Class A Director of the Company. Ruhfus was previously the Chief Executive Officer of Summerfield Hotel Corporation prior to its being acquired by Wyndham in 1998. As a result of the Acquisition, Ruhfus' 22,500 stock options immediately vested. Defendant Ruhfus holds an ownership interest in seven different Summerfield Suites Hotels. In 2004, Wyndham provided approximately $1.1 million in hotel management, franchise and other

services to these hotels.  Ruhfus is a citizen of Kansas and can be served at 565 North Broadmoor, Wichita, Kansas 67226.

33.     Defendant Lawrence Ruisi ("Ruisi") is a member of the Board of the Company. Defendant Ruisi is, and at all relevant times, was a Class C Director of the Company.  As a result of the Acquisition, Ruisi's 9,374 stock options immediately vested.  Ruisi is a citizen of New York and can be served at 121 Whippoorwill Road, Armonk, New York 10504.

34.     Defendant Scott A. Schoen ("Schoen") is a member of the Board of the Company. Defendant Schoen is, and at all relevant times, was a Class B Director of the Company.  Schoen has been employed by Thomas H. Lee Partners since 1986 and currently serves as a managing director. As a result of the Acquisition, Schoen's 45,000 stock options immediately vested.  Schoen is a citizen of Massachusetts and can be served at 191 Kings Grant Road, Weston, Massachusetts 02493.

35.     Defendant Scott M. Sperling ("Sperling") is a member of the Board of the Company. Defendant Sperling is, and at all relevant times, was a Class B Director of the Company.  Sperling, as a member of the Company's capital committee, participated in negotiations in connection with the Acquisition – ensuring that TLP's interests were well protected.  As a result of the Acquisition, Sperling's 22,500 stock options immediately vested.   Sperling is managing director of Thomas H. Lee Partners and trustee and general partner of various THL equity funds.  Additionally, Sperling is a director of Beacon Capital Partners.  Sperling is a citizen of Pennsylvania and can be served at 4 Moore Road, Sewickley, Pennsylvania 15143.

36.     Defendant Lynn C. Swann ("Swann") is a member of the Board of the Company. Defendant Swann is, and at all relevant times, was a Class A Director of the Company.   In September 2003, Wyndham entered into a two year consulting agreement with Swann.  Swann provides Wyndham with consulting services related to the development and expansion of its collegiate and professional sports marketing plans and sales initiatives.  He is required to make a

certain number of personal appearances a year on Wyndham's behalf and to appear in a certain amount of advertisements to promote Wyndham. The agreement entitles Swann to ongoing payments of $250,000 per year. Additionally, defendant Swann was granted 100,000 restricted shares of Class A common stock upon execution of agreement. The shares vest in two equal installments in September 2004 and September 2005. As a result of the Acquisition, Swann's 147,500 stock options immediately vested. Swann is a citizen of Pennsylvania and can be served at Merriman Road, Sewickley, Pennsylvania 15143.

37. Defendant Sherwood M. Weiser ("Weiser") is a member of the Board of the Company. Defendant Weiser is, and at all relevant times, was a Class A Director of the Company. Weiser holds an ownership interest in the Holiday Inn, Dayton Mall, in Dayton, Ohio. In 2004, Wyndham provided approximately $76,475 in hotel management, franchise and other services to this hotel. Weiser served as a member of the special committee that reviewed and negotiated the Recapitalization. As a result of the Acquisition, Weiser's 73,966 stock options immediately vested. Weisner is a citizen of Florida and can be served at 10 Edgewater Drive, Miami, Florida 33133.

38. The defendants identified in ¶¶19-37 are sometimes collectively referred to as the "Individual Defendants."

### DEFENDANTS' FIDUCIARY DUTIES

39. Under Delaware law, in any situation where the directors of a publicly traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation and its shareholders, and if such transaction will result in a change of corporate control, the corporation and its shareholders are entitled to receive a significant premium. To diligently comply with these duties, the directors and/or officers may not take any action that:

(a)     adversely affects the value provided to the corporation or its shareholders;

(b)     will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits themselves from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation and its shareholders; and/or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the corporation and its public shareholders.

40.     In accordance with their duties of loyalty and good faith, defendants, as directors and/or officers of Wyndham, were obligated under Delaware law to refrain from:

(a)     participating in any transaction where the directors' or officers' loyalties are divided;

(b)     participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the corporation or its public shareholders; and/or

(c)     benefiting themselves at the expense or to the detriment of the corporation and its shareholders.

41.     Plaintiff alleges herein that defendants, separately and together, in connection with the Acquisition, have knowingly or recklessly violated their fiduciary duties, including their duties of loyalty, due care, good faith, fair dealing, independence, and candor owed to Wyndham and its public shareholders.  Defendants have engaged in self-dealing, and have obtained for themselves personal benefits, including personal financial benefits not shared equally by Wyndham or the Class, or have aided and abetted others who did so.  As a result of defendants' self-dealing and divided loyalties, among other things, the negotiation process for the Acquisition was tainted and unfair, and

the Class failed to receive an adequate or fair process or price for their Wyndham common stock in the Acquisition.

42.     Defendants also owe the Company and its stockholders a duty of truthfulness under Delaware law, which includes the disclosure of all material facts concerning the Acquisition. Defendants have knowingly or recklessly breached their fiduciary duties of candor and good faith, or aided and abetted others who did so, by failing to disclose all material information concerning the Acquisition and the true value of the Company.

43.     Because defendants have knowingly or recklessly breached their duties of loyalty, good faith, fair dealing, independence and candor in connection with the Acquisition or aided and abetted others who did so, the burden of proving the inherent or entire fairness of the Acquisition (including all aspects of its negotiation, structure, price and terms) is placed upon defendants as a matter of law.  Defendants cannot meet that burden.

## THE ENTIRE FAIRNESS STANDARD

44.     In any situation where majority *or* controlling shareholders stand on both sides of a challenged transaction, the entire fairness standard is implicated, and the defendants, at least initially, bear the burden of demonstrating the two basic aspects of ***fair dealing*** and ***fair price***.

45.     The concept of fair dealing embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.  The concept of fair price relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects and any other elements that affect the intrinsic or inherent value of a company's stock.

46.     The test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness.

47.     To demonstrate entire fairness, the defendants must present evidence of the cumulative manner by which they discharged all of their fiduciary duties.  An entire fairness analysis then requires the Court to consider carefully how the board of directors discharged all of its fiduciary duties with regard to each aspect of the non-bifurcated components of entire fairness: fair dealing and fair price.

48.     The burden of proof may shift to the plaintiff, however, only if defendants can demonstrate an approval of the transaction by a truly independent committee of directors who have real bargaining power that can be exerted in dealings with a majority or controlling shareholder who does not dictate the terms of the merger, or the inclusion of a majority of the minority provision in the merger agreement – defendants can demonstrate neither in this case.  As such, the burden to prove the entire fairness of the Acquisition will remain with defendants.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all holders of Wyndham's common stock who were harmed by defendants' actions described below (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any defendant.

50.     This action is properly maintainable as a class action.

51.     The Class is so numerous that joinder of all members is impracticable.  According to Wyndham's SEC filings, there were more than 172 million shares of Wyndham common stock outstanding as of May 19, 2005.

52.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include, *inter alia*, the following:

(a)     whether defendants breached their fiduciary duties of undivided loyalty, independence or due care with respect to plaintiff and the other members of the Class in connection with the Acquisition;

(b)     whether the Individual Defendants engaged in self-dealing in connection with the Acquisition and whether the Individual Defendants unjustly enriched themselves and other Wyndham insiders;

(c)     whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Acquisition, including the duties of loyalty, due care, good faith, diligence, honesty, candor and fair dealing, and/or other fiduciary duties;

(d)     whether defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other offers for the Company or its assets; and

(e)     whether plaintiff and the other members of the Class suffered injury from the Acquisition being consummated.

53.     Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

54.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

55.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

56.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

57.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### BACKGROUND TO THE ACQUISITION

58.     Wyndham was a corporation existing under the laws of the State of Delaware, with its principle place of business in Dallas, Texas.  Wyndham offers upscale and luxury hotel and resort accommodations through proprietary lodging brands and a management services division. Wyndham owns, leases, manages and franchises hotels and resorts in the United States, Canada, Mexico, the Caribbean and Europe.

59.     Prior to consummation of the Acquisition, Wyndham had Class A common stock, Classes A and B convertible preferred stock and Class C participating preferred stock.  As of June 15, 2005, Wyndham had approximately 172.8 million shares of Class A common stock issued and outstanding and approximately 16.1 million shares of Class B preferred stock issued and outstanding.

60.     The Class B preferred stockholders control the Board of Directors through the structure of the Board and the special voting preferences granted to Class B stock.[2]  Wyndham's

---

[2]     Pursuant to the terms of the Class A (no voting rights) and B preferred stock issued in June 1999, preferred stock dividends were payable quarterly, on a cumulative basis, at a rate of 9.75% per year, for the first six years with the dividends structured to ensure an aggregate fixed cash dividend payment of $29,250 per year.  However, Wyndham's credit facility prohibited it from paying the cash portion of the preferred stock dividend until expiration or further amendment of its credit facility and the cash portion of the dividend had not been paid

Board of Directors consists of 19 members represented by three separate classes: Class A, Class B and Class C.  Class A directors consist of eight directors, who are elected by the Class A common stockholders.  Class B directors consist of eight directors, who are elected by the Class B preferred stockholders.  Class C directors consist of three directors, who are elected by both the Class A common stockholders and Class B preferred stockholders.  Each share of the Class A stock is entitled to one vote per share while each share of the Class B stock is entitled to 12.7009 votes per share.  Accordingly, the voting preference gives the Class B stockholders a majority of the votes in electing the three Class C directors.  Based upon June 15, 2005 shares, Class A stockholders would have been entitled to cast 172.7 million votes for Class C directors while Class B stockholders would have been entitled to cast 204.5 million votes for Class C directors.

61.     As of May 2004, the following entities owned 100% of the Class B preferred stock: Apollo investors, Beacon investors, THL investors, Chase Equity Associates, L.P., CMS Investors, CKE Investors, PW Hotel I, LLC and PaineWebber Capital, Inc., Guayacan Investors, Strategic Real Estate Investors and The Bonnybrook Trust, the Franklin Trust and the Dartmouth Trust. Additionally, this group of investors owned 50.2% of the outstanding shares of Class A common stock, with an additional 9.3% of the common stock being owned by the individual directors and officers of the Company.  The Apollo investors, the Beacon investors and the THL investors are the major holders of the preferred stock.  Collectively they hold 91.4% of the outstanding Class B stock.

62.     Not surprisingly all eight of the Class B directors are related to either the Apollo investors, the Beacon investors or the THL investors as either officers, directors or partners and in many instances are also founding principals of the entities.  Defendants Black, Rowan, Mack and

but had accrued since 2002.  As of December 31, 2004, cash dividends totaling $102.3 million on the preferred stock had been in arrears and unpaid for a period of more than 60 days.

Neibart are substantially involved with the Apollo investors.  Defendant Leventhal is substantially

involved with the Beacon investors and defendants Lee, Schoen and Sperling are substantially

involved with the THL investors.  As a result of this structure and the other employment and

financial relationships detailed herein at ¶¶19-37, each director is beholden to the Class B preferred

shareholders.

63.    In May 2005 it was reported that the Company had put itself up for sale.  An article

appearing in BizNewOrleans.com dated May 11, 2005 entitled "WSJ: Wyndham International

seeking a buyer," stated in relevant part:

> Wyndham International Inc. has put itself up for sale, according to a report today by
> The Wall Street Journal.
>
> Wyndham has 142 hotels and resorts in 10 countries in its franchise system,
> including 33 it owns and leases.  The company operates four hotels in the greater
> New Orleans area.
>
> The hotel chain's stock and debt are valued at about $3.7 billion.  For the past
> several years, the company has been paying down debt by selling off its nonstrategic
> hotels, slashing administrative costs and refinancing its debt in order to slim itself
> down to a "branded hotel operating company" focusing on the Wyndham branded
> hotels, the Journal reported.
>
> Wyndham, which reported earnings yesterday, had first-quarter revenue of
> $282.6 million and a loss of 14 cents a share.  The company said it expected to
> complete its planned $1.65 billion debt refinancing this week, extending its
> corporate-debt maturities to 2011.
>
> A Wyndham spokeswoman told the Journal: "We're not commenting on
> market rumors and speculation."
>
> The Dallas-based company owns, leases, manages and franchises the
> Wyndham Hotels & Resorts, Wyndham Luxury Resorts, Summerfield Suites and
> Viva Wyndham Resorts.

64.    On May 17, 2005, Wyndham filed a Form 8-K with the Securities and Exchange

Commission (the "SEC") advising that its previously issued financial statements for fiscal 2004

could "no longer be relied upon":

**ITEM 4.02A   NON-RELIANCE ON PREVIOUSLY ISSUED FINANCIAL STATEMENTS OR A RELATED AUDIT REPORT OR COMPLETED INTERIM REVIEW**

During the quarter ended March 31, 2005, as Wyndham International, Inc. (the "Company" or "Wyndham") was continuing to remediate internal controls over financial reporting previously disclosed in its December 31, 2004 Annual Report on Form 10-K, the Company identified an additional tax charge of $1.7 million related to 2004 and reconsidered other previously identified but deemed immaterial adjustments related primarily to accruals of unbilled legal and consulting fees aggregating $1.8 million related to 2004.  The Company's Audit Committee and management consider the charges to be immaterial to the Company's financial position and the results of operations for the year ended December 31, 2004. *However, even though the adjustments are only 0.14% of the first quarter 2005 total assets, 0.15% of total liabilities, 2.5% of shareholders' equity and 1.2% of the first quarter 2005 total revenues, the $3.5 million adjustments as a percentage of the first quarter 2005 loss from continuing operations of $48,000 are significant. As a result, on May 11, 2005 it was determined that the financial statements for the year ended December 31, 2004 should no longer be relied upon.*

The restatement resulted in the Company adjusting its previously reported 2004 net loss of $509.5 million ($4.01 per share) to net loss of $512.9 million ($4.03 per share).

65.    On May 17, 2005, the Company also amended its previously filed Form 10-K for the fiscal year ending December 31, 2004, indicating that the 10-K had not been updated based on the review conducted and that only the limited changes had been made as outlined in the preceding paragraph:

This amended Annual Report on Form 10-K/A has not been updated except as required to reflect the effects of the foregoing restatement.  In order to preserve the nature and character of the disclosures set forth in such items as originally filed, no attempt has been made in this amendment to modify or update the disclosures in the original Annual Report on Form 10-K except for the foregoing restatement. *As a result, this amended Annual Report on Form 10-K/A contains forward-looking information which has not been updated for events subsequent to the date of the original filing, and all information contained in this amended Annual Report on Form 10-K/A and the original Annual Report on Form 10-K is subject to updating and supplementing as provided in the periodic reports that the Company has filed and/or will file with the SEC after the original filing date of the Annual Report on Form 10-K.*

66.    On May 24, 2005, the fiscal 2004 10-K was once again amended to add the report of Wyndham's independent accountants made in connection with the restatement:

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Shareholders
Wyndham International, Inc.:

We have completed an integrated audit of Wyndham International Inc.'s 2004 consolidated financial statements and of its internal control over financial reporting as of December 31, 2004 and audits of its 2003 and 2002 consolidated financial statements in accordance with the standards of the Public Company Accounting Oversight Board (United States).  Our opinions, based on our audits, are presented below.

*       *       *

As described in Note 2b to the consolidated financial statements, the Company has restated its 2004 consolidated financial statements.

**Internal control over financial reporting**

Also, we have audited management's assessment, included in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A, ***that Wyndham International Inc. did not maintain effective internal control over financial reporting as of December 31, 2004, because Wyndham International, Inc. did not maintain effective controls over the accounting and review of income taxes and the determination of deferred income taxes and the related valuation allowance***, based on criteria established in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).  The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting.  Our responsibility is to express opinions on management's assessment and on the effectiveness of the Company's internal control over financial reporting based on our audit.

*       *       *

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.  The following material weakness has been identified and included in management's assessment.  As of December 31, 2004, Wyndham International, Inc. did not maintain effective controls over the accounting and review of income taxes and the determination of deferred income taxes and the related valuation allowance.  Specifically, the Company did not maintain effective controls over the reconciliation of its income tax assets and liabilities to the underlying differences between the tax basis and accounting basis of each component of the Company's balance sheet.  In addition, the related income tax asset valuation allowance was not reconciled to the underlying supporting detail.  This control deficiency resulted in an audit adjustment to the fourth quarter 2004 consolidated financial statements.  For the quarter ended March 31, 2005, the Company identified an additional adjustment of a write-off of

- 21 -

income tax receivable related to 2004, which resulted in the restatement of the 2004 financial statements described in Note 2b.  ***Additionally, this control deficiency could result in a misstatement of income taxes payable, deferred income tax assets and liabilities and the related income tax provision that could result in a material misstatement to the annual or interim financial statements that would not be prevented or detected***.  Accordingly, management determined that this control deficiency constitutes a material weakness.

*      *      *

/s/ PricewaterhouseCoopers LLP
Dallas, Texas

March 15, 2005 with respect to our opinion relating to the consolidated financial statements and financial statement schedules, except for Note 2b to the consolidated financial statements related to accounting for income taxes, as to which the date is May 16, 2005, and April 8, 2005 with respect to our opinions relating to internal control over financial reporting, except for the penultimate paragraph of Management's Report on Internal Control Over Financial Reporting, as to which the date is May 16, 2005.

## THE WYNDHAM RECAPITALIZATION EFFORT

67.     In April 2005, the Company announced a $1.65 billion refinancing, and two weeks later announced it was undertaking a massive stock recapitalization which, if completed, would have converted all preferred stock into common stock.

68.     On April 15, 2005, the Company announced that, based upon the recommendation of the special committee formed to review and negotiate a change to the Company's capital structure, it had entered into a definitive recapitalization agreement with certain investors in Wyndham's Series A and B Preferred Stock.  In the Recapitalization, the existing classification of Wyndham's common stock would be eliminated, all outstanding shares of Series A and Series B Preferred Stock (including accrued but unpaid dividends) would be converted into common stock and the existing common stockholders would continue to hold shares of common stock.  At the closing of the transaction, the holders of the Series A and Series B preferred stock would own approximately 85% of the outstanding common stock of Wyndham and the existing common stockholders would own approximately 15% of the outstanding common stock of Wyndham.

69.     In May 2005 the Company completed the $1.65 billion refinancing of its corporate credit facilities and the majority of its outstanding mortgage debt, including extending its corporate debt maturities to 2011 (90% of Wyndham's outstanding debt) and pre-funding $100 million in capital to be invested into the Company's owned and leased properties.  This was undertaken to assist the controlling preferred stock holders.

70.     The first six year term of the preferred stock agreement would expire in June 2005 and from that point forward the Board, in compliance with its fiduciary duties, would have to determine if the preferred stock should get cash or stock dividends.  Moreover, in June 2005 another provision would expire requiring that if a change in control or a liquidation of Wyndham occurred, any accrued dividends had to be immediately accelerated and paid.  Moreover, at the end of the six year period in June 2005, the preferred stock was redeemable by Wyndham and the Board, in compliance with its fiduciary duties would be forced to decide whether or not to redeem the preferred stock, thus terminating the preferred dividend at a rate of 9.75% per year.

71.     The Recapitalization was never undertaken after the credit agreement was renegotiated.  Rather than follow the advice of the only special committee created to determine what was fair to Wyndham's minority shareholders, defendants agreed to the terms of the Acquisition which unfairly benefited the interests of the preferred shareholders to the detriment of the minority common stock holders.

**THE ACQUISITION**

72.     On June 14, 2005, the Company issued a press release entitled, "Wyndham International, Inc. Announces Agreement to Be Acquired by The Blackstone Group for $1.15 Per Share or Approximately $3.24 Billion."  The press release stated in relevant part:

> Wyndham International, Inc. announced today that it has entered into a definitive Merger Agreement to be acquired by an affiliate of The Blackstone Group in a transaction valued at $3.24 billion.

Under the terms of the Merger Agreement, Blackstone will acquire all of the outstanding Common Stock of Wyndham for $1.15 per share in cash. The board of directors of Wyndham unanimously approved the Merger Agreement and recommended approval by its shareholders.

Fred J. Kleisner, Wyndham's chairman, president and chief executive officer, said, "Wyndham has followed a strategic approach to: simplify our corporate structure, refinance our debt and sell all non-strategic assets. We have created a stream-lined organization centered around 32 high quality owned and leased hotels and destination resorts plus the world's pre-eminent spa, the Golden Door. All of this has made Wyndham a much desired and sought after company in today's real estate market. In that regard, we are pleased to have signed a merger agreement with Blackstone."

Jonathan D. Gray, senior managing director of The Blackstone Group, said, "We are excited to acquire Wyndham International with its terrific collection of employees, properties and brands. We look forward to working with Wyndham's franchisees, owners and partners."

The completion of the Merger Agreement is subject to various customary closing conditions, including the approval of Wyndham's stockholders and the expiration of the applicable waiting period under the Hart-Scott-Rodino Act. Completion of the Merger Agreement is not subject to the receipt of financing by Blackstone. The closing of the Merger Agreement is expected to occur during the fourth quarter of 2005.

Wyndham previously announced the entry into a definitive Recapitalization Agreement with certain investors of Wyndham's Series B Preferred Stock in which all outstanding shares of Series A and Series B Preferred Stock would be converted into common stock. Under the terms of the Merger Agreement, the holders of shares of Preferred Stock will receive $72.17 per share in cash, subject to potential adjustment to reflect additional shares that may be issued as dividends after June 30, 2005.

Bear, Stearns & Co. Inc. acted as financial advisor to Wyndham in connection with the strategic review and this transaction. J.P. Morgan Securities Inc. provided a fairness opinion in connection with this transaction. Paul, Weiss, Rifkind, Wharton & Garrison LLP acted as legal advisor to Wyndham. Simpson Thacher & Bartlett LLP acted as legal advisor to Blackstone.

73.     Under the terms of the Acquisition, Wyndham's controlling stockholders – entities affiliated with Apollo investors, THL investors, Beacon investors, PaineWebber Capital Inc., Chase Capital Partners and Walt Disney Co. CEO Michael Ovitz – will receive $72.17 a share for their convertible preferred, *or approximately $1.19 billion*. The Acquisition netted them a substantial profit on the $1 billion the controlling preferred shareholders invested in Wyndham in 1999, in

addition to the cash dividend payment of $29,250 per year that each preferred stock share had been granted since 1999.

74.     On June 14, 2004, the Apollo investors, the Beacon investors and the THL investors, holders of over 90% of the Class B preferred stock and approximately 49% of the Company's overall voting power, entered into the Voting Agreement with Blackstone and Wyndham whereby they agreed to vote all of their shares in favor of the Acquisition.   Eight of the directors are substantially involved with one of these interested entities.   In addition, as of June 15, 2005, Wyndham's officers and directors, and their affiliates (excluding the preferred shareholders) collectively held an additional 3.6% of the outstanding voting power of Wyndham – which they expected to vote in favor of the Acquisition.  With nearly 53% of the overall vote locked-up in favor of the Acquisition, the outcome of the shareholder vote on the Acquisition was already determined. As such, the Company's minority shareholders were forced to blindly accept the $1.15 per share consideration that the majority was willing to give them, without adequate disclosures and conflict barriers to ensure fairness.

**SELF-DEALING**

75.     The Class B directors, by reason of their control over the voting power of the Company, had clear and material conflicts of interest and acted to better their own interests at the expense of Wyndham's minority public shareholders.  The Class A and Class C directors, which were overwhelmingly elected by the Class B preferred shareholders, acquiesced in the Class B directors decision in order to retain the lucrative perquisites obtained through membership on the Board, including, among other things, $20,000 annual retainers, at least $1,000 per board meeting attended, generous stock option grants and consulting agreements.   By reason of the foregoing, defendants breached their fiduciary duties to the members of the Class.

76.     A special committee of independent directors was not formed by the Wyndham Board to negotiate the Acquisition despite the clear and well-recognized conflicts of interest pertaining to the Wyndham Board and Bear Stearns.  Defendants' failure to utilize a special committee is even more egregious in this situation given that one was formed to review and negotiate the Recapitalization with the Company's Class A and B preferred shareholders.  Nonetheless, the use of a special committee would have been entirely irrelevant as any member would have obvious conflicts of interest, in light of, *inter alia*, their allegiance to the Class B preferred shareholders.  Thus, the process by which the Acquisition was conducted was procedurally flawed and unfair.

77.     The Acquisition was wrongful, unfair and harmful to Wyndham's minority public stockholders, and represents an effort by defendants to aggrandize their own financial position and interests at the expense of and to the detriment of the Class members.  Through the Acquisition, defendants unfairly denied Wyndham's minority shareholders their rights while usurping the same for the benefit of the Individual Defendants on unfair terms.

78.     In particular, defendants' caused Wyndham to misstate its financial results, operate without internal controls, expend millions of dollars on professional and legal fees structuring the refinancing for the benefit of the preferred stock holders and agreed to terms in the Acquisition (and refused to negotiate in good faith with other potential acquirers) only to benefit the preferred shareholders rather than redeeming and/or canceling the preferred stock – which would have allowed the minority to continue to participate in the Company's future growth instead of being cashed out for a mere $1.15 per share.

79.     The preferred stockholders used their control to negotiate a sale of Wyndham that disposes of Wyndham at a price and pursuant to terms which benefit preferred holders to the detriment of common stockholders.  Moreover, as part of the Merger Agreement, defendants agreed

to provisions which all but precluded a better offer from materializing, including unlawful "no-solicitation" and termination fee provisions.

80.    Because the preferred stockholders dominated and controlled the business and corporate affairs of Wyndham, and all defendants were in possession of private corporate information concerning Wyndham's assets, business and future prospects, there existed an imbalance and disparity of knowledge and economic power between them and the public minority shareholders of Wyndham which made it inherently unfair for them to reap such disproportionate benefits to the exclusion of maximizing stockholder value for the minority shareholders.

## THE CONFLICTED FINANCIAL ADVISORS

**Bear Stearns**

81.    Bear Stearns was retained by the Wyndham Board to purportedly serve as its financial advisor.  However, Bears Stearns' own significant interest in seeing the transaction close, regardless of the fairness of the terms and price to Wyndham and its non-affiliated shareholders, and its extensive long-term relationships with Blackstone, Wyndham's executives and the Apollo investors and other preferred holders, prevented it from fulfilling its fiduciary duties to Wyndham and its unaffiliated shareholders.

82.    In 1999, Bear Stearns advised an investor group led by an entity affiliated with the Apollo investors when it initially invested $1 billion in Wyndham.  Bear Stearns went on to advise Wyndham, at the behest of the Company's management and the preferred holder directors, in various divestitures of what bankers describe as "nonproprietary branded properties," usually about 20 hotels at a time.  Bear Stearns earned tens of millions of dollars in investment banking fees along the way.

83.    Bear Stearns is also well acquainted with Blackstone, having been actively involved in the real estate business of Blackstone, Wyndham's acquiror in the Acquisition, for years.  Bear

Stearns had a financial interest adverse to Wyndham in the Acquisition, including not only a *bona fide* interest in continuing to receive future business from Blackstone, but an actual equity interest in Blackstone Real Estate Partners, IV – the very same Blackstone entity that acquired Wyndham – as well as in other Blackstone entities.

84.     Among other dealings, Bear Stearns and its affiliates have provided investment banking services to Blackstone, including advising Blackstone and/or providing financing or other services in connection with numerous Blackstone acquisitions.  For example, in 2001, Blackstone began acquiring "extended stay" hotel assets with the acquisition of Homestead Village, Inc. ("Homestead").   These holdings primarily consist of efficiency units that provide guests with amenities suitable for periods beyond the needs of the casual vacationer (*i.e.* the units have built in stove tops and kitchens).  Bear Stearns assisted in placing sophisticated financing for a significant portion of Blackstone's extended stay portfolio hotels through the commercial mortgage pass-through ("CMBS") market.

85.     On April 1, 2004, Blackstone placed $460 million in CMBS certificates sold by Bear Stearns Commercial Mortgage Securities Series 2004-HS2.  The deal was collateralized by mortgage loans secured by Blackstone's extended stay properties, and Blackstone was able to provide strong sponsorship to the deal through its Homestead Village Management portfolio company.  Blackstone and Gray were advised in the Homestead acquisition by Charles Edelman ("Edelman") and Lonnie Henry ("Henry") of Bear Stearns.  Bear Stearns also helped provide financing for that acquisition, and received millions of dollars in fees from Blackstone for its investment banking and financing services related to the Homestead acquisition.

86.     In May 2004, Blackstone and Gray closed another major hotel acquisition through its purchase of Extended Stay America ("Extended Stay").  Edelman and Henry of Bear Stearns acted as financial advisor to Blackstone in this $3.1 billion acquisition.  Bear Stearns also helped provide

financing.  Bear Stearns was paid millions in fees by Blackstone for its investment banking and financing services related to this acquisition.

87.     In October 2004, Blackstone and Gray closed yet another major hotel acquisition, this time of Prime Hospitality, Inc. ("Prime") for $790 million.   In the Prime acquisition, the Bear Stearns team of Edelman and Henry purported to represent Prime (similar to their representation of Wyndham here) rather than their long-time business associates Blackstone and Gray.  In issuing an opinion related to the Prime acquisition, the Delaware Chancery Court described Bear Stearns as "clearly conflicted" in representing Prime given its long-standing and ongoing ties with Blackstone.  The same conflicts are present here as were present in the Prime case.  Moreover, at the same time Bear Stearns was purportedly working for Prime (as with Wyndham), it had an equity interest in Blackstone Real Estate Partners, IV – the very same Blackstone entity that was acquiring Prime (and later Wyndham) – as well as in other Blackstone entities.

88.     In December 2004, Blackstone and Gray closed another major hotel acquisition, this time of Boca Resorts Inc.  Edelman and Henry of Bear Stearns acted as financial advisor to Blackstone in this $1.23 billion acquisition.  Bear Stearns also helped provide financing.  Bear Stearns was paid millions in fees by Blackstone for its investment banking and financing services related to this acquisition.

89.     Bear Stearns has also recently provided services to Blackstone, or entities in which Blackstone has or had a substantial interest, including but not limited to Vanguard Health Systems, Inc., Celanese Corporation, Spirit Group, Encoda Systems Holdings Inc., Hyatt Regency Maui Resort and Spa, and Vivendi Universal Entertainment.

90.     Bear Stearns was initially engaged by defendants to act as the Company's financial advisor in connection with any sale of the Company or other strategic alternative.  On February 16, 2005, during a Board meeting, Bear Stearns was asked to provide a financing package for any

potential acquisition of the Company that it would make available to all potential purchasers, which it agreed to do. Defendants permitted Bear Stearns to provide financing for the Acquisition despite the conflict of interest created by allowing it to act as both the Company's financial advisor and a possible financing source in connection with a third-party acquisition of the Company. As the financing source for the Acquisition, Bear Stearns had a strong incentive to decrease or downplay the value for which the Company was ultimately sold in order to minimize the risk it would face as a result of financing the Acquisition.

91.     Indeed, Blackstone only committed to a $550 million equity investment in Wyndham, with Bear Stearns, along with Wachovia Bank, N.A., committing to provide the other $2.8 billion in debt financing needed to complete the Acquisition.

**J.P. Morgan**

92.     J.P. Morgan was retained by the Wyndham Board to provide a purported "fairness" opinion in connection with the Acquisition only after the Board approved Bear Stearns dual role as financial advisor/negotiator and financier. Defendants have failed to disclose what portion, if any, of the $1.5 million J.P. Morgan was paid to render a fairness opinion was contingent upon the Acquisition being consummated.

93.     J.P. Morgan has close ties to Blackstone and the preferred investors group as well. J.P. Morgan just advised upon and co-underwrote Blackstone's bid for Wind, the telecoms arm of Italian utility Enel, in April 2005. J.P. Morgan also served as a lead arranger in Blackstone's November 2004 secondary buyout (505 million EURO debt financed purchase) of Gerresheimer Glas.

94.     In September 2004, it was announced that J.P. Morgan and Apollo had agreed to buy AMC Entertainment for $2 billion. In fact, Blackstone, J.P. Morgan and the Apollo investors are all three Second Secured Lenders to German company PrimaCom AG. In January 2005, they obtained

an injunction from a German court permanently enjoining PrimaCom AG's planned sale of its subsidiary, Multikabel, stating that the terms were unfair to them as creditors of PrimaCom AG.

95.     In September 2003, J.P. Morgan served as Apollo's advisor in its co-purchase of Ondeo Nalco Co., the U.S. water treatment arm of Franco-Belgian conglomerate Suez SA, with Blackstone for $4.35 billion.

96.     In March 2005, J.P. Morgan and Bear Stearns advised Wyndham on its sale of 23 hotels to a private investment fund for $366 million.  J.P. Morgan and Bear Stearns were also joint book runners on Wyndham's May 2005 $1.65 billion refinancing of its corporate credit facilities and the majority of its outstanding mortgage debt, including extending its corporate debt maturities to 2011 (90% of Wyndham's outstanding debt) and pre-funding $100 million in capital to be invested into the Company's owned and leased properties.

97.     As of June 13, 2005, the date of its fairness opinion, a J.P. Morgan venture capital affiliate owned 402,673,972 shares of Wyndham series B preferred stock, representing approximately 2.5% of the Company's outstanding series B preferred stock.

98.     Under the terms of their engagements to provide financial advising services to Wyndham in connection with the Acquisition, the fees of J.P. Morgan and Bear Stearns would both be significantly limited if they concluded the terms of the Acquisition were not fair to Wyndham and its public shareholders.

## MATERIAL NON-DISCLOSURES

99.     By reason of their positions with Wyndham, defendants were in possession of non-public information concerning the financial condition and prospects of Wyndham, and especially the true value and expected increased future value of Wyndham and its assets, which they failed to adequately disclose to Wyndham's public stockholders.

100.     Defendants, on July 20, 2005, filed with the SEC and disseminated to the Company's public shareholders the Proxy, which misrepresented and/or omitted material information concerning the Acquisition necessary to ensure a fully-informed shareholder vote, including, among other things:

- defendants' reasons for considering the Acquisition to be a "change of control" for purposes of employment compensation benefits but not for purposes of preferred stock liquidation preferences;

- defendants' reasons for not appointing an independent special committee to consider the Acquisition given the substantial conflicts of interest of the Board members and Bear Stearns, and the fact that they formed a purportedly independent special committee to review, evaluate and negotiate the Recapitalization;

- information regarding the steps taken by the Board to protect shareholders from the conflicts of interest suffered by Bear Stearns as a result of its agreement to provide financing for the Acquisition;

- information regarding the director defendants' stock options, whether vested or unvested, and the corresponding strike prices, as well as any restricted stock units, both of which were cashed out in connection with the Acquisition;

- information as what percentage, if any, of the fee paid to J.P. Morgan for rendering a fairness opinion was contingent upon consummation of the Acquisition;

- information underlying the analyses substantiating J.P. Morgan's fairness opinion including, among other things, the sizes of the companies and values of the transactions associated with the mergers used by J.P. Morgan in its Selected Transaction Analysis;

- information regarding: (i) the reason the compensation committee of the Board established a $4 million "bonus pool" payable to designated Wyndham employees upon the consummation of the Acquisition, and (ii) whether and to what extent any of the Company's officers and/or directors received any of the $4 million;

- defendants' reasons for not employing a "majority of the minority" voting structure for approval of the Acquisition given that nearly 53% of the vote was locked up via the Voting Agreement;

- any effects the restatement and investigation concerning the Company's inadequate internal controls revealed; and

- information as to whether any separate consideration was paid to the investor parties for entering into the Voting Agreement.

101. This information was material to Wyndham's minority shareholders because it would have allowed them to make an independent and fully-informed decision as to the Board members' interests and motives in approving and recommending the Acquisition, the validity and reliability of the fairness opinion issued in connection with the Acquisition, whether a fair sale process was conducted, and whether they were receiving adequate value for their interests in the Company.

102. In addition, defendants breached their fiduciary duties of candor by failing to provide information regarding the favorable financial results of Wyndham's second quarter of 2005 prior to the announcement of the Acquisition, thus putting an artificial cap on the Company's common stock and preventing the full value of Wyndham's common stock from being realized.

## FIRST CAUSE OF ACTION

### Claim for Breach of Fiduciary Duties

103. Plaintiff repeats and realleges each allegation set forth herein.

104. Defendants have violated their fiduciary duties of care, loyalty, good faith, candor and independence owed under applicable law to Wyndham's public minority shareholders and have acted to put their personal interests ahead of the interests of Wyndham's public minority shareholders.

105. By the acts, transactions and courses of conduct alleged herein, defendants, individually and acting as a part of a common plan, advanced their own interests at the expense of and detriment to Wyndham's public minority shareholders.

106. The Individual Defendants violated their fiduciary duties by entering into a transaction with Blackstone without regard to the fairness of the transaction to Wyndham's public minority shareholders.

107.    The Individual Defendants also violated their fiduciary duties by failing to provide Wyndham's public shareholders with material information concerning the Acquisition.

108.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to Wyndham's public minority shareholders because, among other reasons:

(a)    they failed to properly value Wyndham; and

(b)    they ignored or did not protect against the numerous conflicts of interest resulting from their own interrelationships and financial connections, as well as those that exist between Bear Stearns, Blackstone and JP Morgan, in connection with the Acquisition.

109.    Because the Individual Defendants dominated and controlled the business and corporate affairs of Wyndham, and were in possession of private corporate information concerning Wyndham's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them, the Company and the public shareholders of Wyndham which made it inherently unfair for them to pursue any transaction wherein they would reap disproportionate benefits.

110.    By reason of the foregoing acts, practices and course of conduct, defendants failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Wyndham and the Class.

111.    Defendants engaged in self-dealing and acted in bad faith towards Wyndham's minority shareholders and the Class.

112.    As a result of defendants' egregious breaches of fiduciary duty, Wyndham's public minority shareholders suffered substantial damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and all others similarly situated, demands damages in its favor and in favor of the Class and against defendants as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Declaring and decreeing that the Acquisition agreement was entered into in breach of the fiduciary duties of the defendants and is therefore unlawful and unenforceable;

C.     Directing defendants to pay plaintiffs and other members of the Class the damages they incurred from defendants' breach of their fiduciary duties;

D.     Rescinding, to the extent already implemented, the Acquisition or any of the terms thereof;

E.     Imposition of a constructive trust, in favor of plaintiff, upon any benefits improperly received by defendants as a result of their wrongful conduct, including all stock option grants and restricted stock units that vested upon the change of control of the Company;

F.     Awarding plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

G.     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 9, 2005            PROVOST & UMPHREY LAW FIRM, LLP
                                    JOE KENDALL
                                    State Bar No. 11260700
                                    WILLIE C. BRISCOE
                                    State Bar No. 24001788


                                    _____
                                         s/ JOE KENDALL
                                          JOE KENDALL

- 35 -

3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
RANDALL J. BARON
A. RICK ATWOOD, JR.
SHAUN L. GROVE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

S:\CasesSD\Wyndham\CPT00026690.doc

CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ JOE KENDALL
JOE KENDALL

PROVOST & UMPHREY LAW FIRM, LLP
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

# Mailing Information for a Case 3:05-cv-01323

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **R Thaddeus Behrens**
  behrenst@haynesboone.com madejc@haynesboone.com

- **Willie Briscoe**
  Provost_Dallas@yahoo.com
  wbriscoe@provostumphrey.com;bgribble@provostumphrey.com

- **Nicholas Even**
  nick.even@haynesboone.com cecelia.madej@haynesboone.com

- **Orrin Lea Harrison, III**
  oharrison@akingump.com
  cblea@akingump.com,kdunning@akingump.com,cvarner@akingump.com

- **Joe Kendall**
  Provost_Dallas@yahoo.com jkendall@provostumphrey.com

- **Scott T Williams**
  swilliams@akingump.com abartell@akingump.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)